## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

|  |  |  |
|---|---|---|
| JOSEPH R. KARSNER, IV, | * | |
| Petitioner, | * | NASD Case No.: 04-07343 |
| | | Civil Action No.: 1:07-cv-00965-RJL |
| v. | * | |
| JOANN HINKS and | * | |
| THE NATIONAL ASSOCIATION OF | | |
| SECURITIES DEALERS, | * | |
| Respondents. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MARYLAND SECURITIES COMMISSIONER'S
### MOTION TO INTERVENE

Pursuant to Rules 24(a) and (b) of the Federal Rules of Civil Procedure, the Maryland Securities Commissioner, Melanie Senter Lubin, by and through undersigned counsel, moves for leave to intervene in this proceeding seeking an order to confirm an arbitration panel's recommendation of expungement. We attach hereto a motion to dismiss or deny petitioner's request for confirmation setting forth the Securities Commissioner's reasons for opposing confirmation based upon public policy and procedural grounds. As reasons for intervening, the Securities Commissioner states:[1]

1.    The Maryland Securities Commissioner (the "Securities Commissioner") is the

---

[1] The New York Attorney General's motion to intervene for purposes of opposing a request for expungement of CRD records was granted by the State of New York Supreme Court, County of Erie, in the matter of *Parker et al. v. Salzberg et al.*, Case No. I-2007-01942. Recognizing the strong public policy interest against expunging CRD records based upon negotiated settlements, the Court recently issued a decision ordering a rehearing by the arbitrators on the issue of expungement. *See* Parker decision attached as Exh. 1 hereto.

administrator of the Securities Division of the Office of the Attorney General of Maryland, and as such is responsible for the regulation of the securities industry in Maryland pursuant to the Maryland Securities Act.  *See* Title 11, Md. Code Ann., Corps. and Ass'ns (1999 Repl. Vol. & Supp. 2006) (the "Securities Act").

2.    The Securities Commissioner is charged with protecting the investing citizens of Maryland by ensuring compliance with the Securities Act by all those who offer or sell securities in or from Maryland, and by investigating complaints of fraud or improper practices in connection with the offer or sale of securities or the providing of investment advice.

3.    The Securities Commissioner registers securities offerings and the persons who sell them, and provides information to the public regarding a company's or individual's registration status and disciplinary history as those facts are contained on the Central Registration Depository ("CRD") system, a computerized registration database for the securities industry.  That information also is used by the Securities Commissioner as a factor in registration and enforcement decisions.

4.     The records of petitioner Karsner's (the "petitioner") registration and disciplinary history, like those of almost all registered industry participants, is maintained by the National Association of Securities Dealers ("NASD") on the CRD system.  Furthermore, because petitioner was a Maryland resident, doing business in Maryland, he was required to be registered by the Securities Commissioner, via the CRD, to conduct business in Maryland.

5.    Petitioner also was required by Maryland law to disclose in his CRD records certain disciplinary information, including customer complaints and arbitrations, and to update that information as needed.

6.    Although the CRD system is maintained by NASD, the records contained on CRD

are the joint property of all securities regulators, including all U.S. state securities administrators.[2]

Those administrators rely on its contents not only to decide on requests from persons who apply for registration or seek to renew their registration status, but also as a factor in decisions pertaining to disciplinary actions taken against the registrants by the regulators. Moreover, information on the CRD is made available to citizens who seek information from their state regulator about industry personnel with whom they are considering entrusting their investment funds.

7.    Petitioner Karsner seeks to expunge the facts of an arbitration case based upon an arbitration panel's recommendation that all references to the arbitration be expunged from his registration records maintained on CRD.

a.    The petitioner, together with his former employer Legacy Financial Services, Inc. ("Legacy"), was the subject of an arbitration proceeding brought by Joann Hinks, a Maryland resident, who alleged that unsuitable investment recommendations by petitioner caused losses of $45,224 in her account.

b.    The parties to the arbitration proceeding entered into a confidential agreement to settle the matter based upon terms and conditions that were not disclosed to the arbitration

---

[2] The State of Maryland's joint property rights to the information contained in the CRD system has been recognized under the contract between NASAA and the NASD:

> The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.

Paragraph 3(e) of the CRD Agreement Amendment, dated December 13, 1996, attached as Exh. 2 to Memorandum in Support of Maryland Securities Commissioner's Motion to Intervene.

panel.

       c.     As part of the agreement, the parties agreed that petitioner and Legacy were not liable for the counts listed in the Statement (and Amended Statement) of Claim, and that the investments were suitable.

       d.     Upon a motion of both parties, and without a hearing or the review of any substantive evidence by the arbitration panel, the arbitration panel entered a Stipulated Award dismissing with prejudice all claims against petitioner Karsner and Legacy, and recommending that the facts of the arbitration case be expunged from petitioner's CRD records.

       e.     Subsequent to the arbitration proceeding, and as required by regulations under the Maryland Securities Act, Legacy amended Karsner's CRD records to disclose that the terms of the settlement included the payment by Legacy of $25,000 to Hinks.

8.     Karsner has also filed five additional petitions to expunge records of arbitration cases.

9.     The NASD has declined to oppose other expungement requests made by Karsner and has not yet notified the Securities Commissioner of its intentions with respect to this expungement request.

10.     Because the possibility exists that the NASD may not oppose expungement in this matter as contemplated by the United States Securities and Exchange Commission ("SEC") in approving NASD Rule 2130, the Maryland Securities Commissioner has the obligation to represent the interests of investors, regulators, and the integrity of the CRD system.

11.     In a notice adopting changes to NASD's expungement rule, Rule 2130, the SEC

- 4 -

noted that state regulators, including the Maryland Securities Commissioner, would be able to intervene in expungement matters handled by the courts as a means of ensuring that the court is made aware of the investor protection and regulatory implications of expungement.  Federal Register, Vol. 68, No. 247, p. 74671 (12/24/03), reading in pertinent part:

> As a further means to ensure that the court is made aware of the investor protection and regulatory implications of an expungement, NASD noted that states will be able to intervene if they have concerns regarding whether investor protection or regulatory issues have been fairly considered by the NASD. [. . .] To the extent that the state(s) wishes to intervene, it could so petition the court.

12.     The CRD records of an individual registered, or previously registered, with a state securities agency are the records of the state agency, in this case the Maryland Division of Securities. The Securities Commissioner has an interest in the preservation of those state records and is thus concerned that the expungement of the CRD records will negatively impact her ability to fulfill her statutory duties.

13.     The Securities Commissioner therefore seeks to intervene in this proceeding.

14.     The Securities Commissioner may intervene as of right, as provided in Rule 24(a)(2), Fed. R. Civ. P., because she has an interest in the property (CRD records) or transaction (expungement) in question as having an impact on her duties, and because judgment for petitioner may impair or impede the Securities Commissioner's ability to protect that interest, in that expungement of these records will remove information required by Maryland law that is relevant to her ability to fulfill her state-law-mandated responsibilities.   There is no other party that can or will adequately represent that interest.

15.     Alternatively, the Securities Commissioner should be permitted to intervene under Rule 24(b)(2) because her interest in opposing petitioner's request for expungement of records arises

from common facts forming the basis of petitioner's claim against the NASD.  Intervention by the Securities Commissioner will not unduly delay or prejudice the adjudication of the rights of the original parties.

16.     The NASD does not oppose the Securities Commissioner's motion to intervene.

WHEREFORE, the Securities Commissioner requests that this motion be granted, that she be allowed to intervene in this proceeding, and that a hearing be set in this matter.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland

_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783

_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-6337

June 12, 2007

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing Motion To Intervene, memorandum

in support thereof, and proposed Order, by causing a copy to be sent by regular mail, to:

George S. Mahaffey, Jr., Esq.
Goodell, DeVries, Leech & Dann, LLP
One South St., 20th Floor
Baltimore, MD 21202
*Counsel for Petitioner Joseph Karsner*


Terri L. Reicher, Esq.
NASD Registration and Disclosure Department
2nd Floor
9509 Key West Avenue
Rockville, MD 20850
*Counsel for NASD, Respondent*


William B. Young, Jr., Esq.
Colling, Gilbert, Wright & Carter
801 N. Orange Avenue, Ste 830
Orlando, FL 32801
*Counsel for Joann Hinks, Respondent*


June 12, 2007                               /s/
                            _____
                                      Kelvin M. Blake

EXHIBIT 1

Catherine Grantier Cooley, Esq.  R. Verle Johnson, Esq.
Hodgson Russ, LLP     Assistant Attorney General
Attorney for Petitioners    Attorney for Third-Party Intervenor
140 Pearl Street, Suite 100   120 Broadway, 23rd Floor
Buffalo, NY 14202     New York, NY 10271

---

  The Court has considered the following papers: Verified Petition dated February 26, 2007; Notice of Motion to Intervene dated April 11, 2007; Affirmation of R. Verle Johnson, Esq. dated April 11, 2007; Affirmation of Catherine Grantier Cooley, Esq. dated April 17, 2007; Affirmation of R. Verle Johnson, Esq. dated May 7, 2007; Supplemental Affirmation of Catherine Grantier Cooley, Esq. dated May 14, 2007; Answer of Third-Party Intervenor dated May 21, 2007; letters to the Court by Alice Salzberg dated March 9, 2007 and April 9, 2007.

  Petitioners Sage, Rutty & Co., Inc. and Douglas Parker commenced this special proceeding pursuant to Article 75 of the CPLR and the National Association of Securities Dealers, Inc. ("NASD") Rule 2130 to confirm a Stipulated Award from an NASD arbitration panel issued on December 22, 2006. Respondent Alice C. Salzberg claims that the entire award should be vacated because she entered into an agreement to settle her claims against Petitioners under duress from her attorney at the time, Douglas Foss, Esq. Third-Party Intervenor Attorney General opposes confirmation of the portion of the Stipulated Award recommending expungement of Ms. Salzberg's claims, and asks the Court to vacate that portion of the award under CPLR 7511.

  On July 25, 2005, Respondent Salzberg filed a Statement of Claim with the NASD, contending that Petitioners pursued financially unsuitable investments and breached their fiduciary duties. In their Answer, Petitioners denied all of Ms. Salzberg's claims. An NASD arbitration panel was set to hear evidence, but at the first scheduled

2

hearing on September 25, 2006, the parties, through their counsel, verbally entered into a settlement agreement. Respondent Salzberg contends that at the time she was under duress from her attorney to settle her claims. However, Salzberg signed the Stipulated Award drafted by the NASD arbitration panel on October 27, 2006. A portion of the Stipulated Award recommends that the Salzberg complaint be expunged from Douglas Parker's registration records maintained by the Central Registration Depository ("CRD") because the panel found that "the claim, allegation, or information is factually impossible or clearly erroneous" (*see* Verified Petition Ex. C). Pursuant to Rule 2130 of NASD procedures, Petitioners then requested that the Court direct expungement of the records, and Petitioners notified the NASD of the proceeding. The NASD declined to oppose the petition, but the Court granted the Attorney General's motion to intervene to oppose that portion of the award which recommends expungement.

The purpose of the CRD system is have a centralized database where complete and accurate information on securities dealers is available to the public. Investors want access to accurate and meaningful information when they choose a broker. Brokers want their reputations to remain intact, and they want inaccurate complaints expunged from public record. The NASD and the States want to fulfill their regulatory responsibilities to both brokers and investors. Rule 2130 is an attempt to strike a balance between all these competing interests by retaining factually accurate claims and expunging false claims. The rule seeks to protect all interests by allowing for judicial review of arbitration awards that recommend expungement.

In 2004, the Securities and Exchange Commission ("SEC") approved Rule 2130, which outlines the instances in which expungement of CRD records is appropriate. Rule 2130 requires NASD arbitrators to make an affirmative finding that expungement is appropriate because an investor's claims were factually impossible, clearly erroneous, or false. Arbitration panels and courts should ensure that at least one of these standards

3

is met before recommending or directing expungement (*see* Notice 04-16, Johnson Aff. 4/11/07 Ex. 5). In a case in which parties settle an arbitration proceeding, the arbitration panel still must make affirmative findings based on one of the standards in Rule 2130, and the panel can require the submission of documents or a brief evidentiary hearing in order to make such findings (*see id.*).

Rule 2130 promotes a type of judicial review of arbitration awards, but judicial review of arbitration awards under the CPLR is limited. New York embraces a policy supporting arbitration and discouraging judicial interference with the arbitration process and arbitration awards (*see Matter of New York City Tr. Auth. v Transport Workers Union of Am.*, 99 NY2d 1, 6 [2002]). An award should only be vacated under the narrow circumstances listed in CPLR 7511(b)(1), including corruption, fraud or misconduct by arbitrators, partiality of arbitrators, or instances where arbitrators exceeded their power. Arbitrators exceed their power if their awards are totally irrational or violative of a strong public policy (*see Matter of Silverman v Benmor Coats, Inc.*, 61 NY2d 299 [1984]). Stipulated awards based on a settlement should "not be set aside on facts less than needed to avoid a contract, e.g., fraud, overreaching, mistake, duress, or some other ground of similar nature" (*see Matter of Goldstein v Preisler*, 24 AD3d 441 [2005]).

In order to reconcile Rule 2130 with New York's policies supporting settlement and arbitration, courts must analyze these proceedings on a case-by-case basis, and courts should only disrupt awards or stipulated awards if there is something uniquely troubling about the dispute.

In this case, there are aspects of the Stipulated Award which trouble the Court. The arbitrators found that Ms. Salzberg's claims were factually impossible or clearly erroneous, but there is not a single fact or circumstance described upon which the arbitrators base this conclusion (*see* Stipulated Award, Verified Petition Ex. C). A

hearing was never conducted, no written settlement agreement was ever drafted, and no other documents were submitted. In that sense, the arbitrators' decision on expungement is irrational because it was made without any evidentiary support. There is nothing in the award which the Court can rely upon in order to fulfill its responsibility under Rule 2130.

Furthermore, the Court must be mindful of a strong public policy interest. There is a threat that in NASD disputes such as these, brokers will entice aggrieved investors to settle factually accurate claims if they agree to sign a Stipulated Award recommending expungement. This threat, similar to the threat of a strike suit in corporate matters, promotes private interests at the expense of states, potential investors, and the public generally. The judicial review mechanisms in Rule 2130 were put in place to specifically protect the public interest from this kind of threat. The lack of a discussion of the factual inaccuracies of Ms. Salzberg's claims in the Stipulated Award prevents the Court from assuring that this threat is not present.

The Court is not persuaded by Petitioners' argument that similar awards and stipulated awards have been confirmed by other courts without incident. First, many of the cases which Petitioners cite occurred before adoption of Rule 2130. Additionally, the cases which Petitioners cite involve awards or stipulated awards based on hearings or some other type of fact-gathering conducted by the arbitrators. For example, petitioners cite a recent order from this District by Judge John Curran (*see* Cooley Supp. Aff. Ex. 1). In that case, arbitrators recommended expungement in their stipulated award because they determined that the accused broker did not even participate in the transactions alleged, making it impossible for him to be involved. Judge Curran directed for expungement of these records because there was ample evidence that the arbitrators had a rational basis for their decision, unlike the situation before this Court.

Due to the uncertainty regarding the veracity of Ms. Salzberg's claim, strong

public policy interests, and the unique circumstances of this proceeding, the Court is unable to direct expungement of the claims from Petitioners' CRD records. However, the Court is also unable to permanently vacate the portion of the award recommending expungement because expungement could very well be appropriate under Rule 2130. At this time, there are simply no facts before the Court necessary to make a reasonable determination that one of the standards for expungement in Rule 2130 was met. Therefore, pursuant to CPLR 7511(d), the Court orders a rehearing by the arbitrators to clarify the facts and circumstances which led them to conclude that "the claim, allegation, or information is factually impossible or clearly erroneous."

The rehearing will be limited to the issue of expungement alone. The Court will not entertain Ms. Salzberg's claim that the entire award be vacated. Petitioners are correct that Ms. Salzberg is not entitled to her defense of duress because she had over a month from the alleged date of duress to sign the Stipulated Award. There is no evidence that on October 27, 2006, Ms. Salzberg signed the Stipulated Award against her free will.

Submit Order accordingly.

**Hon. Diane Y. Devlin**
Justice of the Supreme Court

DATED:    May 30, 2007
         Buffalo, New York

6

IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

JOSEPH R. KARSNER, IV,                        *

                    Petitioner,               *       NASD Case No.: 04-07343
                                                      Civil Action No.: 1:07-cv-00965-RJL
        v.                                    *

JOANN HINKS and                               *
THE NATIONAL ASSOCIATION OF
SECURITIES DEALERS,                           *

                    Respondents.              *
*       *       *       *       *       *       *       *       *       *       *       *       *       *

MEMORANDUM IN SUPPORT OF THE
MARYLAND SECURITIES COMMISSIONER'S
MOTION TO INTERVENE

<u>INTRODUCTION</u>

Maryland Securities Commissioner Melanie Senter Lubin (the "Securities

Commissioner") seeks leave to intervene in this proceeding as of right and, alternatively,

permissively, pursuant to Rule 24, Federal Rules of Civil Procedure.  The Securities

Commissioner seeks to intervene in order to oppose petitioner's request for expungement of facts

about an arbitration proceeding from his records on the Central Registration Depository ("CRD")

system.  The Securities Commissioner urges that expungement of the arbitration from

petitioner's records is not in the public's interest.  The Securities Commissioner's intervention is

necessary in order to ensure that her authority and responsibility to enforce the Maryland

Securities Act, Title 11, Md. Code Ann., Corps. & Ass'ns (1999 Repl. Vol. & Cum. Supp. 2006)

(the "Securities Act") for the protection of Maryland investors and others is not hampered by the

expungement of records that the Securities Commissioner requires, relies upon, and co-owns with the National Association of Securities Dealers ("NASD"). Furthermore, subject matter jurisdiction does not properly lie with this Court such that the petition for confirmation should be dismissed.

BACKGROUND

A.    <u>The Maryland Securities Commissioner</u>

The Securities Commissioner is authorized to enforce the Maryland Securities Act in order to protect Maryland and other investors. Md. Code Ann., Corps. and Ass'ns, section 11-101 *et seq., passim*. That responsibility includes reviewing the applications (including the full registration and disciplinary history) of those who seek to be licensed in Maryland to transact securities business. It also includes making available to investors information regarding the registration and disciplinary history of a company or individual with whom the investors are considering entrusting their investment funds. Furthermore, it includes evaluating the history of registered or non-registered individuals when deciding whether to investigate and/or take enforcement action against an individual.

The Securities Commissioner determines who may hold a license to offer and sell securities in Maryland, and acts in the public interest to protect the investing public. Access to timely, accurate, and complete information about a securities professional's conduct and status is thus vital to the meaningful exercise of the Securities Commissioner's responsibilities. No area of that registration history may be more important than an applicant's or registrant's disciplinary history of customer complaints or arbitrations. These records are necessary for the Securities Commissioner to fulfill her statutory duties.

- 2 -

B.      NASD and the "CRD"

The records of the petitioner's registration and disciplinary history, like that of almost all registered industry participants, is maintained by the NASD on the CRD, a computerized registration database for the securities industry.  The CRD serves as an information-gathering/ organizing/ retrieval system for the state (including Maryland) and federal securities regulators – a single uniform form (Form U4), rather than duplicative filings in each state, may be filed with the CRD by a current or potential registrant.  Because each state independently requires, evaluates, and draws conclusions based on the facts contained on the form, all original uniform forms filed with the CRD are deemed to be filed in each state in which the person seeks to be registered as a securities professional.  Expungement from the CRD will alter a record required and maintained in each state in which the individual is or was registered.

The North American Securities Administrators Association, Inc. ("NASAA")[1], on behalf of its members including the Maryland Division of Securities, and the NASD have entered into a contractual relationship whereby the NASD has agreed to maintain and administer a database of information pertaining to securities professionals on the CRD so that state and federal securities administrators, including the Securities Commissioner, can use that information to evaluate current and potential registrants.  The CRD is maintained by the NASD, but the information filed with the system is the joint property of all state securities regulators.  The State of Maryland's joint property rights to the information contained in the CRD system, as a third party beneficiary to the NASAA/NASD contract, has been recognized under the contract:

---

[1] NASAA is the oldest international organization devoted to investor protection.  NASAA's membership consists of 67 state, provincial, and territorial securities administrators in the 50 states, the District of Columbia, Puerto Rico, the U. S. Virgin Islands, Canada, and Mexico.

> The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.[2]

> Paragraph 3(e) of the CRD Agreement Amendment, dated December 13, 1996, attached as Exh. 2.

As joint owner of CRD records, the Securities Commissioner has an interest in ensuring completeness and accuracy of the CRD records. The Securities Commissioner relies on its contents not only to decide on requests from persons who apply for registration or seek to renew their registration status, but also as a factor in decisions pertaining to disciplinary actions taken against the registrants. Moreover, information on the CRD is made available to those calling their state regulators seeking information about industry personnel. Furthermore, as records of and held in each state securities administrator's control, the CRD records are subject to relevant state public records laws.

To conduct securities business in Maryland, an individual is required to apply for registration with the Maryland Securities Division as an agent by filing a Form U4 through the CRD. Md. Code Ann., Corps. and Ass'ns, §§11-401 and 11-405. Form U4 requires the disclosure of certain information including customer complaints and arbitrations. Based upon information contained in an applicant's Form U4, the Securities Commissioner makes a decision whether to register that individual. The Securities Commissioner's decision is independent of

---

[2]    A "CRD State" is defined at section 2.07 of the CRD Agreement as a U.S. state, territory or possession, or the District of Columbia or Puerto Rico, or Mexico, or a province or territory of Canada that elects to implement its Licensing function through the CRD. . ." *See* pages 1 and 4 of CRD Agreement, dated January 1993, attached as Exh. 1.

the NASD's decision to register an individual, and at times may differ.

Under Maryland law, an individual has an obligation to keep the information contained in his/her Form U4 accurate and complete. If any information contained in an individual's Form U4 becomes inaccurate or incomplete, the individual is required to file an amended Form U4, through the CRD, updating or correcting the incorrect or incomplete information. *Id.*, §11-411.

Petitioner Karsner was registered with NASD and with the State of Maryland. Those registrations were required in order to transact business in securities in accordance with relevant state and federal securities laws. Karsner's CRD records reflect a significant number of customer complaints and/or arbitrations. Karsner now seeks to expunge any record of the arbitration in the case at hand, and that of three other cases also before this Court.[3] *Karsner v. Catalano et al.*, Civil Action No.: 1:07-cv-507-RCL; *Karsner v. Pattee et al.*, Civil Action No.: 1:07-cv-00920-RJL; and *Karsner v. Padgett et al.*, Civil Action No.: 1:07-cv-00966-RJL. As indicated in Karsner's petition for confirmation, he intends to file a number of additional petitions asking the Court to expunge other complaints/arbitrations filed against him. Additionally, Karsner is the subject of an Order to Show Cause issued by the Securities Commissioner, and an on-going investigation of his securities activities. The Securities Commissioner, because of her concerns

---

[3] Two additional petitions for confirmation filed by Karsner have already been granted by this Court. See *Karsner v. Simpson et al.*, Civil Action No.: 1:07-cv-00378-RMU and *Karsner v. Lothian et al*, Civil Action No.: 1:07-cv-00334-RJL. In *Karsner v. Simpson et al.*, the Securities Commissioner's motion to intervene was filed by e-mail before, but on the same day that, the Court's order of confirmation was issued. Because of the delay associated with e-mail filings, it is believed that the motion to intervene was not received by the Judge until after the Court's order was issued. In *Karsner v. Lothian et al.*, this Court, in confirming the arbitration panel's recommendation of expungement, denied both the Securities Commissioner's motion to intervene and motion for reconsideration but gave no reason for its decisions.

that Karsner is attempting to use the expungement process as a way of cleansing his CRD record and, thus, distorting his disciplinary history, opposes his request of expungement.

C.    <u>Procedural events leading to this Motion</u>

Petitioner Karsner, together with his former employer Legacy Financial Services, Inc. ("Legacy"), was the subject of an arbitration proceeding brought by a complaining investor, Joann Hinks.  The investor alleged that the unsuitable investment recommendations caused losses of $45,224 in her account.  Prior to a hearing, the parties to the arbitration proceeding entered into a confidential agreement to settle the matter, based upon terms and conditions that were not disclosed to the arbitration panel.  As part of the agreement, the parties stipulated that petitioner Karsner and Legacy were not liable for the counts listed in the Statement of Claim (and Amended Statement of Claim) and that the investments were suitable.

Upon a motion of both parties, and without a hearing or the review of any substantive evidence by the arbitration panel, the panel entered a Stipulated Award dismissing with prejudice all claims against petitioner Karsner and Legacy, and recommending that the facts of the arbitration case be expunged from Karsner's CRD records.

Subsequent to the arbitration proceeding, and as required by regulations under the Maryland Securities Act, Legacy amended Karsner's CRD records to disclose that a payment of $25,000 was made to the complainant in connection with the settlement of the arbitration proceeding.[4]  Karsner then petitioned this Court for an order of expungement, which would result in the removal from his CRD records of all mention of the customer complaint and the arbitration.

---

[4]    Payment of the $25,000 was made by Legacy who is not a party to this proceeding.

The Securities Commissioner now seeks to intervene.

ARGUMENT

Under controlling law, the intervention of the Securities Commissioner may occur as of right or by permission.  The Securities Commissioner meets the standards for both types of intervention.

I.    THE SECURITIES COMMISSIONER HAS A RIGHT TO INTERVENE

Rule 24(a)(2), Fed. R. Civ. P., sets forth the requirements for intervention as of right.  A party moving for intervention as of right must:  (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action.  *SEC v. Prudential Securities Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998).

a.    The Securities Commissioner's application is timely.

The Maryland Securities Commissioner's motion to intervene is timely.  Timeliness, under Rule 24, is not specifically defined but instead is to be determined by the court in its sound discretion based upon all the circumstances.  *National Association for the Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973).   The Court of Appeals for the District of Columbia has stated that timeliness "is to be judged in consideration of all the circumstances especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *U.S. v. British American Tobacco Australia Services, Ltd*, 437 F.3d 1235, 1238 (D.C. Cir. 2006).

The Securities Commissioner's Motion to Intervene is timely filed as it is filed prior to

the Court's decision on any pertinent issues or substantive matters, and within the time

prescribed for the filing of a response by Respondents.

Further, whatever minor delay may result in allowing the Securities Commissioner to

intervene in this case would be outweighed by the Securities Commissioner's interests in this

case, which would be severely impaired were intervention denied.

In *Karsner v. Lothian*, Case No. 1:07-cv-00334-RJL, the case attached as an exhibit to the

petition filed in this case, petitioner argued that the Securities Commissioner's Motion to

Intervene was untimely because it was not filed within the 90-day period set forth under §12 of

the Federal Arbitration Act for filing notices to modify or vacate.  The 90-day statute of

limitations under §12 of the FAA, however, should not apply in this situation:  the Securities

Commissioner was not a party to the underlying arbitration, and the petition to confirm the

arbitration panel's recommendation of expungement was filed more than 90 days after the award

was entered.  Because she was not a party to the underlying arbitration proceeding, the Securities

Commissioner did not know, and had no reason to know, of the arbitration panel's expungement

recommendation until petitioner filed this proceeding, nearly a year after the recommendation

was entered.[5]    Simply put, the Securities Commissioner was not put on notice that her property

rights to petitioner's CRD records were at risk of being detrimentally affected and, thus, could

not have intervened within the 90-day time period applicable to parties to the arbitration.  §12 of

the FAA should not be interpreted in such a way that it denies to non-parties the right to protect

their interests under such circumstances.

---

[5]    The arbitration panel's award was entered on June 5, 2006.  Petitioner initiated this
proceeding to confirm the arbitration panel's award on May 23, 2007.

Moreover, the Securities Commissioner has set forth non-statutory grounds for opposing the confirmation of the arbitrators' recommendation of expungement, and therefore the statute of limitations set forth under §12 of the FAA is inapplicable. *See* 94 AMJUR TRIALS 211 §30, Non-statutory vacatur or clarification ("A party may challenge an arbitration award under a contract that is subject to the FAA and may base vacatur on common law or other judicial-recognized bases. These include an attack on an award for such reasons as the award is irrational, arbitrary and capricious; or is in manifest disregard of the law; or the relief contravenes public policy; or there is no contract to arbitrate. These are all challenges that do not rely on the FAA and, thus, are not bound by the FAA limitations period.").

The timeliness prong is satisfied.

    b.    <u>The Securities Commissioner has a substantial interest in this matter, which may be impaired by the Court's decision.</u>

The Securities Commissioner's motion to intervene satisfies the second and third requirements for intervention as of right. The records at stake are jointly owned by the Commissioner, and their threatened erasure impairs her ability to fulfill her duties under Maryland law.

Indeed, expunging the record of the complaint and arbitration from the CRD will remove the information not only from the Securities Commissioner's consideration, but also from the consideration of every other state securities administrator. An award issued in an arbitration proceeding involving private parties should not negatively affect a property right held by a state agency without that agency's input.

The Securities Commissioner, like every state regulator, needs to be able to identify licensees who are subjects of customer complaints or arbitrations in order to determine any

patterns of improper conduct and allegations of customer losses or dissatisfaction. The Securities

Commissioner also needs to be able to identify the broker-dealer firms that regularly hire brokers

with histories of customer complaints or arbitrations, as perhaps warranting closer review or

examination of the sufficiency of supervision. The Securities Commissioner may base an

investigation on a pattern of customer arbitration filings, or use that information as a factor in

determining sanctions. Expunging the record of such filings will remove them from the

Securities Commissioner's consideration and greatly impair her ability to carry out her

regulatory, investigatory, and enforcement duties.

As the principal executive officer of the Maryland Securities Division, the Securities

Commissioner is the "official custodian" of the Division's records and, as such, is responsible for

maintaining the records of the Division. Md. Code Ann., State Gov't, §10-611 (2004); Md. Code

Ann., Corps. and Ass'ns, §11-201. Under Maryland law, a public record is defined to include

any documentary material that is received by the unit or instrumentality in connection with the

transaction of public business. State Gov't, §10-611. That record may take any form including,

but not limited to, a computerized record such as the records maintained on the CRD system.

Expungement of the arbitration from the CRD system will make it impossible for the Securities

Commissioner to comply with Maryland's public records laws.

For these reasons, the Securities Commissioner needs and is required by law to maintain

the complete disciplinary and other records of her registrants; expungement will prevent that.

The Securities Commissioner should be granted leave to intervene to more fully present these

facts to the Court in opposition to the petition for confirmation.

    c.    <u>The Securities Commissioner's interests are not adequately represented by any other party</u>.

The Securities Commissioner's interest is to protect the investing citizens of the State of Maryland, by ensuring compliance with the Maryland Securities Act and investigating complaints of fraud or improper practices.  The NASD is not a "state actor" and, thus, its interests differ from those of the Securities Commissioner.  *See Desiderio v. National Association of Securities Dealers, Inc.*, 2 F.Supp.2d 516, 518 (S.D.N.Y. 1998); *see also First Jersey Securities Inc. v. Bergen*, 605 F.2d 690, 699 n.5 (3d. Cir. 1979).  The NASD is concerned with maintaining the registration and licensing information of its member firms and representatives in accordance with NASD rules and federal law, not state law.  The NASD's reasons for maintaining the completeness and accuracy of the CRD system are not identical to those of state regulators, including the Maryland Securities Commissioner, who is governed by state mandates, including public records laws.  Therefore, the Securities Commissioner's interests would not be adequately represented by the existing parties.

II.    <u>THIS COURT SHOULD, ALTERNATIVELY, PERMIT THE SECURITIES COMMISSIONER TO INTERVENE</u>

Under Rule 24(b)(2), an applicant may be permitted to intervene in an action "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.Proc. 24(b)(2).

The Securities Commissioner's motion to intervene satisfies that requirement.  The Securities Commissioner's interest in opposing petitioner's request for expungement arises from the same common facts as petitioner's claim against the NASD.  In addition, permitting the Securities Commissioner to intervene would be an appropriate exercise of discretion because the Securities Commissioner is in the best position to present the State of Maryland's investor

protection and regulatory concerns arising from the expungement request.

Furthermore, because this application has been timely filed, and because the Securities Commissioner's pleadings in opposition to the expungement of records are attached hereto, granting of the Securities Commissioner's motion will not delay or prejudice the adjudication of the rights of the other parties.

CONCLUSION

WHEREFORE, for the reasons set forth above, the Securities Commissioner requests that she be allowed to intervene in this proceeding.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland


_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783


_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-6337

June 12, 2007

## CRD AGREEMENT

THIS AGREEMENT is made and entered into as of the second day of January, 1993, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

## WITNESSETH:

**WHEREAS,** state securities regulators have the regulatory authority under the laws of the United States and the state governments to license Broker-dealers, Agents and other securities professionals who operate within or from their jurisdictions; and

**WHEREAS,** NASAA and NASD (the "parties") entered into an agreement to create the Central Registration Depository (the "CRD"), which began operations in 1981, for the purpose of converting multiple paper-based Licensing and regulatory processes onto a single national computer system that facilitates state, self-regulatory organization and federal regulation of securities professionals (the "1980 Agreement"); and

**WHEREAS,** the parties wish to restate and replace that 1980 Agreement, as amended from time to time, with a new agreement to reflect the new relationship between the parties and the redevelopment of the CRD as specified in this agreement together with all Exhibits to be agreed upon by the parties and attached hereto and incorporated herein (the "CRD Agreement"); and

**WHEREAS,** through the development of the CRD, the parties have established a facility for the timely collection of Licensing fees required to be paid to state governments for the Licensing of Broker-dealers, Agents and other securities professionals and established a process to account for and distribute state Licensing fees to each participating government agency; and

**WHEREAS,** the parties acknowledge that, by virtue of the process established by the CRD for the sharing of Licensing information and the collection of Licensing fees to be paid to the state governments and the proper accounting for and distribution of those fees, state governments are third party beneficiaries of this CRD Agreement; and

**WHEREAS,** the parties are committed to the establishment of uniform procedures, definitions, and interpretations through cooperative efforts to promote observance of federal and

## Exhibit 1

4

investment adviser or investment adviser representative license, at such time, if any, when investment advisers and/or investment adviser representatives are included on the CRD.

2.04 **CRD Access Configuration (or CAC)** means the computer processors, software, firmware, leased lines facilities, network access ports, network routing facilities and such other data communications equipment as may be installed and maintained by the NASD for the purpose of connecting CRD Workstations and Printers to the central CRD system. The CAC permits connected CRD Workstations to transmit CRD transactions and receive responses and disseminated data and report files from the central CRD system.

2.05 **CRD Data** means the data filed with and maintained by CRD.

2.06 **CRD Printer** means an output device used by state staff to print out central CRD system-generated activity reports, rosters and database query responses. CRD printers are connected to the central CRD system via the CAC.

2.07 **CRD State** means any of the states of the United States, the District of Columbia, Puerto Rico and any of the United States territories and possessions, Mexico, and any of the provinces and territories of Canada that elects to implement its Licensing function through the CRD, provided that access to the central CRD system and software and hardware maintenance can be made available at reasonable cost, as determined by the parties, and is permissible pursuant to applicable government regulations.

2.08 **CRD Workstation** means a computer display device used by state staff to interactively access the central CRD system application. CRD workstations are connected to the central CRD system via the CAC.

## CRD AGREEMENT AMENDMENT

THIS AMENDMENT is made and entered into as of the *13th* day of *December* 1996, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

In consideration of the mutual promises of the parties, and the mutual agreements, covenants, and conditions hereinafter contained, it is hereby agreed as follows:

1.     The CRD Agreement entered into as of the second day of January, 1993, which terminated June 30, 1994, is hereby reinstated as of June 30, 1994, in all respects.

2.     The Initial Exhibits described at *Section 2.12* of the Agreement, and attached to this Amendment, are hereby accepted by the parties.

3.     The Agreement is further amended as follows:

a.     The text of Section 2.04 is amended by the addition of the following sentence:

Initial CAC specifications and material changes to CAC specifications shall be approved by the Steering Committee.

b.     The following two sentences are added to Section 2.11:

In the event of any conflict among the Exhibits between any two statements, the more specific statement shall prevail. Any disagreement in identifying the more specific statement shall be resolved by the Steering Committee.

c.     The text of Section 2.16 is amended to replace the word "Kansas" with the words "Washington, D.C."

d.     The text of Section 3.05(b) is deleted in its entirety and replaced by the following:

The Steering Committee shall comprise persons appointed by NASAA and by NASD. Each party may name designees of the appointed persons. Each party shall designate one Steering Committee member as the party's delegate, who will, in voting matters, cast that party's vote.

e.     The text of Section 3.10 (a) is deleted in its entirety and replaced by the following:

**Exhibit 2**

The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.

f.    The first sentence of Section 3.10(b) is deleted in its entirety and replaced by the following:

With the exception of paper forms sent to NASD for processing through the NASD's Internal Processing or Emergency Services Units, NASD shall maintain the original of any form not required to be filed electronically for a minimum of three (3) years from the date of filing.

g.    The second sentence of Section 3.14 is deleted in its entirety. The last sentence of the Section is deleted in its entirety and replaced by the following:

The Steering Committee shall approve all applications for substitute CACs and CAC attachments. NASD shall have sole authority for giving operational approval, which will not be withheld unreasonably.

h.    A new section 3.17 is added as follows:

NASD shall provide to NASAA access to CRD documentation related to this Agreement, provided reasonable advance notice has been given.

4.    In the event of a conflict between any term of the CRD Agreement and any term in this Amendment, the term in this Amendment shall prevail.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their duly authorized representatives.

NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.

BY: _____
         (signature)
NAME: _Frank J Formica_
         (print or type)
TITLE: _Vice-President_
         (print or type)
DATE: _12/18/96_
         (print or type)

NORTH AMERICAN SECURITIES
ADMINISTRATORS ASSOCIATION, INC.

BY: _____
         (signature)
NAME: _MARK GRIFFIN_
         (print or type)
TITLE: _President & Chair_
         (print or type)
DATE: _12/13/96_

NASD OGC
NAME: _____
DATE: 12/10/96

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

JOSEPH R. KARSNER, IV,                      *

               Petitioner,            *          NASD Case No.: 04-07343
                                      Civil Action No.: 1:07-cv-00965-RJL

    v.                                      *

JOANN HINKS and                             *
THE NATIONAL ASSOCIATION OF
SECURITIES DEALERS,                         *

          Respondents.                 *
*      *      *      *      *      *      *      *      *      *      *      *      *      *

ORDER GRANTING
MARYLAND SECURITIES COMMISSIONER'S
MOTION TO INTERVENE

       Upon consideration of the Maryland Securities Commissioner's Motion To Intervene in

this proceeding, the Court being fully apprised in the premises and good cause for granting that

Motion having been shown, it is this _____ day of _____ , 2007,

       ORDERED, that the motion be and hereby is granted; and it is further

       ORDERED, that the Maryland Securities Commissioner be added as a Respondent in this

case.

                                      _____
                                      Judge of the U.S. District Court
                                      for the District of Columbia

IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | | |
|---|---|---|
| JOSEPH R. KARSNER, IV, | * | |
| Petitioner, | * | NASD Case No.: 04-07343 |
| | | Civil Action No.: 1:07-cv-00965-RJL |
| v. | * | |
| JOANN HINKS and THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, | * | |
| | * | |
| Respondents. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MARYLAND SECURITIES COMMISSIONER'S
MOTION TO DISMISS OR DENY
PETITION TO CONFIRM ARBITRATION AWARD

The Maryland Securities Commissioner, Melanie Senter Lubin, intervening in this matter by and through undersigned counsel, moves the Court to dismiss or deny Joseph Karsner's Petition to Confirm Arbitration Award.  As a preliminary matter, petitioner has failed to establish that subject matter jurisdiction lies with this Court, and the petition should be dismissed pursuant to Fed. R.  Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  Alternatively, the Securities Commissioner moves this Court to deny Karsner's request on grounds that expungement would be in contravention of public policy.  As reasons therefor, the Securities Commissioner states:

1.      On May 23, 2007, petitioner Karsner filed with this Court a petition to confirm an arbitration award resulting from an arbitration filed against him by his former client Joann Hinks. Hinks named as respondents both Karsner and Legacy Financial Services, Inc. ("Legacy"), Karsner's employer at the time of the actions alleged in the arbitration complaint. Hinks alleged that she was induced by petitioner to invest her account in unsuitable investments that caused losses of $45,224.

2.      Before any hearing in the matter, the parties to the arbitration proceeding entered into a confidential agreement to settle the matter, based upon terms and conditions that were not disclosed to the arbitration panel. The parties stipulated that petitioner and Legacy were not liable for the counts listed in the Statement (and Amended Statement) of Claim, and that the investments were suitable. On June 5, 2006, upon a motion of both parties, the arbitration panel entered a Stipulated Award dismissing with prejudice all claims against petitioner Karsner and Legacy, and recommending that the facts of the arbitration case be expunged from petitioner's records on the Central Registration Depository ("CRD") system.

3.      The current records on CRD shows that Legacy, but not Karsner, agreed to pay Hinks.

4.      As a preliminary matter, the Securities Commissioner moves for dismissal of this action on grounds that petitioner has failed to establish that subject matter jurisdiction properly lies with this Court. There is no claim that this Court has federal question jurisdiction. Moreover, there is no monetary award at stake, and hence no diversity jurisdiction. Assuming arguendo, a monetary award is at stake, neither the amount of damages alleged in the underlying arbitration ($45,224) nor the monetary settlement ($25,000) exceeds the amount required for diversity jurisdiction.

5.      Alternatively, the Securities Commissioner opposes expungement because granting Karsner's petition will impair or impede her ability to fulfill her duty to protect investors in furtherance of the public interest.

6.      The Securities Commissioner is responsible for protecting the investing citizens of Maryland by ensuring compliance with the Securities Act by all who offer or sell securities in or from Maryland, and by investigating complaints of fraud or improper practices related to such transactions.  *See* Title 11, Corporations and Associations Article, Annotated Code of Maryland (1999 Repl. Vol. & Supp. 2006) (the "Securities Act").

7.      The Securities Commissioner registers securities offerings and the persons who sell them, and provides information to the public regarding a company's or individual's registration status and disciplinary history, as contained on the CRD system.  That information is used by the investing public in deciding with whom to entrust their investment funds.  That information also is used by the Securities Commissioner as a factor in registration and enforcement decisions.

8.      Expungement of the facts of this arbitration from petitioner's records, as well as the other arbitrations that petitioner is seeking to expunge, will delete information required by the Securities Commissioner in order to fulfill her state-law-mandated responsibilities.

WHEREFORE, the Securities Commissioner respectfully requests this Court to enter an order dismissing Karsner's Petition to Confirm Arbitration Award or, alternatively, denying the

petition.  The Securities Commissioner also requests that a hearing be set in this matter.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland

_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783

_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-6337

June 12, 2007

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing Maryland Securities Commissioner's Motion To Dismiss or Deny Petition To Confirm Arbitration Award, memorandum in support thereof, and proposed Order, by causing a copy to be sent by regular mail, to:


George S. Mahaffey, Jr., Esq.
Goodell, DeVries, Leech & Dann, LLP
One South St., 20th Floor
Baltimore, MD 21202
*Counsel for Petitioner Joseph Karsner*


Terri L. Reicher, Esq.
NASD Registration and Disclosure Department
2nd Floor
9509 Key West Avenue
Rockville, MD 20850
*Counsel for NASD, Respondent*


William B. Young, Jr., Esq.
Colling, Gilbert, Wright & Carter
801 N. Orange Avenue, Ste 830
Orlando, FL 32801
*Counsel for Joann Hinks, Respondent*


June 12, 2007                     /s/
                                 Kelvin M. Blake

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CIVIL DIVISION

JOSEPH R. KARSNER, IV,                          *

        **Petitioner**,                          *    NASD Case No.: 04-07343
                                        Civil Action No.: 1:07-cv-00965-RJL

    v.                          *

JOANN HINKS and                          *
THE NATIONAL ASSOCIATION OF
SECURITIES DEALERS,                          *

        **Respondents**.                          *
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM IN SUPPORT OF THE
### MARYLAND SECURITIES COMMISSIONER'S
### MOTION TO DISMISS OR DENY
### PETITION TO CONFIRM ARBITRATION AWARD

#### INTRODUCTION

Maryland Securities Commissioner, Melanie Senter Lubin, (the "Securities Commissioner"), respectfully moves this Court to dismiss or deny Joseph Karsner's Petition to Confirm Arbitration Award.  As grounds for her motion, the Securities Commissioner urges that petitioner has failed to establish that subject matter jurisdiction lies with this Court, and the petition should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  Alternatively, the Securities Commissioner moves this Court to deny Joseph Karsner's request to expunge from the Central Registration Depository ("CRD") system all references to an arbitration involving Karsner on grounds that expungement would be in contravention of public policy.

BACKGROUND

A.    The Maryland Securities Commissioner

The Securities Commissioner is charged with enforcing the Maryland Securities Act with the goal of protecting Maryland residents and other investors.  *See* Title 11, Md. Code Ann., Corps. & Associations (1999 Repl. Vol. & Cum. Supp. 2006) (the "Securities Act"), section 11-101 *et seq., passim*.  That responsibility includes reviewing the applications (including the full registration and disciplinary history) of those who seek to be licensed in Maryland to transact securities business.  It also includes providing to inquiring investors information regarding the registration and disciplinary history of a company or individual with whom the investors are considering entrusting their investment funds.  Furthermore, it includes evaluating the history of registered or non-registered individuals when deciding whether to investigate and/or take enforcement action against an individual.

The Securities Commissioner determines who may hold a license to offer and sell securities in Maryland, and therefore acts to protect the investing public, which has a direct and substantial interest in the records relied upon by the Securities Commissioner.  Access to timely, accurate, and complete information about a securities professional's conduct and status, both within Maryland and in other jurisdictions with similar securities laws and registration requirements, is thus vital to the meaningful exercise of the Securities Commissioner's authority.  No area of that registration history may be more important than any disciplinary history of customer complaints, including resulting arbitrations or regulatory actions.

B.    NASD and the "CRD"

The records of the petitioner's registration and disciplinary history, like that of almost all registered industry participants, is maintained by NASD on the CRD, a computerized registration database for the securities industry.  The CRD serves as an information-gathering/organizing/retrieval system for the state (including Maryland) and federal securities regulators – a single uniform form (Form U4), rather than duplicative filings in each state, may be filed with the CRD by a current or potential registrant.  Because each state independently requires, evaluates, and draws conclusions based on the facts contained on the form, all original CRD uniform forms filed with NASD are deemed to be filed in each state in which the person seeks to be registered as a securities professional.  Expungement from the CRD will alter a record actually required and maintained in each state in which the individual is or was registered.

The North American Securities Administrators Association ("NASAA"),[1] on behalf of its members including the Maryland Division of Securities, and the NASD have entered into a contractual relationship whereby the NASD has agreed to maintain and administer a database of information pertaining to securities professionals on the CRD so that the Securities Commissioner can use that information to evaluate current and potential registrants.  The CRD is created and maintained by NASD, but the records contained on CRD are the joint property of all state securities regulators.  The State of Maryland's joint property rights to the information contained in the CRD system, as a third party beneficiary to the NASAA/NASD contract, has

---

[1]  NASAA is the nonprofit corporate association of state, provincial, and territorial securities regulators in the United States, Canada, and Mexico.  It has 67 members, including the securities regulators of Maryland, the District of Columbia, and all other states, and is devoted to protecting investors from fraud and abuse in the offer and sale of securities.

been recognized under the contract:

> The data on CRD Uniform Forms filed with the CRD shall be deemed to have
> been filed with each CRD State in which the applicant seeks to be licensed and
> with the NASD and shall be the joint property of the applicant, NASD, and those
> CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange
> Commission). The compilation constituting the CRD database as a whole shall be
> the property of NASD.[2]

Paragraph 3(e) of the CRD Agreement Amendment, dated December 13, 1996, attached as Exh.
2.

As a joint owner, the Securities Commissioner has an interest in ensuring completeness
and accuracy of the CRD records. The Securities Commissioner relies on its contents not only to
decide on requests from persons who apply for registration or seek to renew their registration
status, but also as a factor in decisions pertaining to disciplinary actions taken against the
registrants. Moreover, information on the CRD is made available to those calling their state
regulators seeking information about industry personnel. Furthermore, as records of and held in
each administrator's control, the CRD records are subject to relevant state public records laws.

Petitioner Karsner was registered with NASD and with the State of Maryland at the time
of the complaint and resulting arbitration, which registration is required in order to transact
securities business in Maryland, in accordance with relevant state and federal securities laws.[3]
Karsner's CRD records reflect a significant number of customer complaints and/or arbitrations.
Karsner now seeks to expunge any record of the arbitration in the case at hand, and that of three

---

[2]   A "CRD State" is defined at section 2.07 of the CRD Agreement as a U.S. state, territory
or possession, or the District of Columbia or Puerto Rico, or Mexico, or a province or territory of
Canada that elects to implement its Licensing function through the CRD. . ." *See* pages 1 and 4
of CRD Agreement, dated January 1993, attached as Exh. 1.

[3]  Karsner's registration in Maryland was voluntarily terminated on January 5, 2006.

other cases also before this Court.[4] *Karsner v. Catalano et al.*, Civil Action No.: 1:07-cv-507-RCL; *Karsner v. Pattee et al.*, Civil Action No.: 1:07-cv-00920-RJL; and *Karsner v. Padgett et al.*, Civil Action No.: 1:07-cv-00966-RJL.  As indicated in Karsner's petition for confirmation, he intends to file a number of additional petitions asking the Court to expunge other complaints/arbitrations filed against him. The Securities Commissioner has concerns that Karsner is attempting to use the expungement process as a way of cleansing his CRD record and, thus, distorting his disciplinary record.  It is because of her use of and reliance on the information in the CRD that the Securities Commissioner opposes expungement here.

C.    Procedural Events

     Hinks filed a Statement of Claim on or about October 19, 2004, alleging that Karsner made unsuitable investment recommendations for her accounts.  Hinks alleged damages of $45,224.  *See* Stipulated Award, attached as Exh. 3 hereto.  Karsner and  Legacy Financial Services, Inc., the brokerage firm that employed Karsner at the time of the alleged events, denied the allegations.  The matter moved to arbitration.

     Without a hearing or the submission of any evidence to the arbitration panel, the parties entered into a settlement agreement whereby they agreed that neither Legacy nor Karsner is liable

---

[4] Two additional petitions for confirmation filed by Karsner have already been granted by this Court.  *See Karsner v. Simpson et al.*, Civil Action No.: 1:07-cv-00378-RMU and *Karsner v. Lothian et al*, Civil Action No.: 1:07-cv-00334-RJL.  In *Karsner v. Simpson*, the Securities Commissioner's motion to intervene was filed by e-mail before, but on the same day that, the Court's order of confirmation was issued.  Because of the delay associated with e-mail filings, it is believed that the motion to intervene was not received by the Judge until after the Court's order was issued.  In *Karsner v. Lothian*, this Court, in confirming the arbitration panel's recommendation of expungement, denied both the Securities Commissioner's motion to intervene and motion for reconsideration but gave no reason for its decisions.

for the counts in the claims, that the investments were suitable, that Hinks would be paid

$25,000, and that the parties would present a stipulated award to the arbitration panel by which

the panel would dismiss the claims and recommend expungement of all CRD records relating to

this arbitration.  The panel approved the stipulated award on June 5, 2006.  On May 23, 2007,

Karsner petitioned this Court for an order to confirm the stipulated arbitration award

recommending expungement of the arbitration records.  A copy of the records that Karsner seeks

to have expunged is Exh. A to the affidavit of Frank Barlow, attached as Exh. 4 hereto.

<u>ARGUMENT</u>

I.    <u>Petitioner fails to establish that subject matter jurisdiction lies with this Court and the
      petition for confirmation should be dismissed pursuant to Federal Rule of Civil Procedure
      12(b)(1).</u>

This Court has held that a motion to dismiss for lack of subject matter jurisdiction will be

granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief." *Gutch v. Federal Republic of Germany*, 444

F.Supp.2d 1, 5 (D.D.C. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 US 555, 561 (1992)).

The burden of establishing that the Court has subject matter jurisdiction lies with the party

seeking to invoke the jurisdiction of the federal court; that burden must be met by a

preponderance of the evidence.  *Isenbarger v. Farmer*, 463 F.Supp.2d 13, 18 (D.D.C. 2006); *see

also Nurse v. Secretary of the Air Force*, 231 F.Supp.2d 323, 326 (D.D.C. 2002).  Further,

because a motion to dismiss for lack of subject matter jurisdiction focuses on a court's power to

hear a claim, this Court has recognized that it has "an affirmative obligation to ensure that it is

acting within the scope of its jurisdictional authority."  *Grand Lodge of the Fraternal Order of

Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C. 2001); *see also Isenbarger*, 463 F.Supp.2d at 18.

Petitioner has failed to establish that subject matter jurisdiction lies with this Court.

A.    Petitioner has failed to establish that this Court has subject matter jurisdiction based upon diversity of citizenship or federal question.

In his Petition to Confirm Arbitration Award, petitioner claims that this Court has subject matter jurisdiction to hear this case based upon diversity of citizenship.  Without any clarification, petitioner simply asserts that the amount in controversy exceeds $75,000 and refers to the arbitration panel's Stipulated Award attached as his Exhibit 1.  The Stipulated Award, however, shows that the claimant alleged damages of only $45,224.  The parties settled the case for $25,000.  Neither amount exceeds the amount required for diversity jurisdiction and this action should be dismissed.

Assuming arguendo that the amount of damages alleged in the underlying arbitration exceeded $75,000, which simply is not the case here, the monetary damages alleged in the underlying arbitration proceeding are not at issue here.  The only issue before this Court is the confirmation of the arbitration panel's recommendation that petitioner's arbitration be expunged from his CRD records.  As recently pointed out by the District Court for the Northern District of Illinois in *Shirley v. Balsamello et al.,* Case No. 06-cv-03414 (N.D. Ill. April 26, 2007), a case analogous to this case, "[i]t is not clear what monetary value, if any, an expungement recommendation has."  *See* copy of *Shirley* decision attached as Exh. 5 hereto.

B.    Subject matter jurisdiction does not exist based upon federal question.

Although not raised in Karsner's petition for confirmation, subject matter jurisdiction also does not exist based upon federal question.  As noted in *Shirley*, the Federal Arbitration Act ("FAA") does not provide a basis for federal subject matter jurisdiction.  *See Shirley*, Exh. 5; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983).

Petitioner has failed to establish that this Court has subject matter jurisdiction to hear this case, thus, the Petition to Confirm Arbitration Award should be dismissed.

II.     <u>Expungement of the arbitration from Petitioner's CRD records would contravene the public policy purpose behind the Maryland Securities Act and the Maryland Public Records Laws.</u>

Denial of the petition for expungement, and retention in the CRD system of the truthful facts relevant to this arbitration proceeding and the underlying complaint, is in the public interest and necessary to the Securities Commissioner's fulfillment of her duties under the Maryland Securities Act.

    A.     <u>Denial of expungement in this case serves the public interest by furthering full disclosure of information material to investors.</u>

The goal of expungement is to erase from the CRD record – from regulatory history, as it were – any record of the event expunged. Where an arbitration panel, after a full hearing, has decided on the basis of the law and the facts that the individual securities professional named was not involved in the transactions at issue, or where the panel affirmatively finds that the claim is false or clearly erroneous, then there might be no record that would be material to a potential investor or to a regulator reviewing that professional's credentials. In that case expungement might protect the professional from the specter of a wrongful allegation.

Where, however, an arbitration is settled pursuant to a confidential agreement involving the payment of funds to the complainant, and a stipulated award is entered without the holding of a hearing or a review by the panel of the law and facts forming the basis for the arbitration claim, then expungement is contrary to the public interest and would impede the regulator's right to enforce the securities laws within her jurisdiction. Expungement especially is inappropriate in cases where the complaint is dismissed without any hearing on the merits. That is the case here.

There was no affirmative finding after an evidentiary hearing by the arbitration panel that the arbitration might be eligible for expungement. This settlement, like myriad others that Karsner has negotiated, provides for a payment of money in exchange for an agreement to expunge CRD records. The information of a complaint and its resolution is material both to the investor when they select professionals to handle their investment funds, and to the Securities Commissioner in carrying out her regulatory duties. The public interest, through the maintenance of public records necessary to effective enforcement of state and federal securities laws, is best served by denying expungement.

  B. <u>Denial of expungement and preservation in the CRD disciplinary record of these facts is necessary for the Securities Commissioner to administer the Maryland Securities Act for the protection of investors.</u>

    1. <u>The record is necessary for registration purposes.</u>

To conduct securities business in Maryland, an individual is required to apply for registration with the Maryland Securities Division as an agent by filing a Form U4 via CRD. Md. Code Ann., Corps. and Ass'ns, §§11-401 and 11-405. The Form U4 requires the disclosure of certain information including customer complaints and arbitrations.

Under Maryland law, an individual has an obligation to keep the information contained in his/her Form U4 accurate and complete. If any information contained in an individual's Form U4 becomes inaccurate or incomplete, the individual is required to file an amended Form U4, via CRD, updating or correcting the incorrect or incomplete information. *Id.*, §11-411.

The Securities Commissioner makes a decision whether to register or discipline an individual based upon the information contained in his/her Form U4. Expunging the record of the complaint and arbitration from the CRD will remove the information from the Securities

Commissioner's review (indeed, from the consideration of every state securities administrator), thereby impairing her ability to perform her statutory obligation to fully evaluate the fitness of potential registrants.

The Securities Commissioner, like every state regulator, needs to be able to identify licensees who are subjects of customer complaints in order to spot any patterns of improper conduct and unexplained customer losses or dissatisfaction. Reliance on information in the CRD is especially important when an applicant, licensed in another state, seeks licensure in Maryland. Such an individual would not be on the Maryland databases, and is not known to the Securities Commissioner. Absent a complete record, the Securities Commissioner might accept the application of someone who has a checkered disciplinary history but whose customer complaints have been expunged. Such a person then would be permitted to solicit Maryland clients who likewise would have no knowledge of the history of customer complaints. The Securities Commissioner has a right, indeed an obligation, to reject the application of such professionals, or to condition the registration upon certain supervisory or monitoring procedures designed for investor protection. Otherwise, the Commissioner must await a new cycle of customer complaints before moving to limit or revoke such registration.

Furthermore, the reporting of such incidents to the Commissioner, albeit on a uniform CRD form, is a requirement of State law precisely because that information is necessary to the Commissioner in the exercise of her duties to protect Maryland investors.

2.    The record is necessary for investigative purposes.

Karsner's CRD records disclose the existence of a significant number of customer complaints and/or arbitrations filed against Karsner. Including the case at hand, there are at least

32 customer complaints and/or arbitrations involving Karsner, some involving stipulated awards with expungement provisions. *See* list attached as Exh. B to Frank Barlow affidavit, Exh. 4. The allegations underlying the complaints and arbitrations involve unsuitable investments, misrepresentation, and mismanagement of client funds. The majority of the complaints and arbitrations have been settled with the payment of monetary compensation; in total, an amount exceeding $1.1 million has been paid to resolve the complaints and arbitrations. Karsner now seeks to expunge any record of at least 6 of the 32 customer complaints and/or arbitrations and, upon information and belief, may be in the process of seeking expungements for a significant number of other complaints and arbitrations.

The Securities Commissioner needs to be able to identify those individuals with histories of customer complaints or arbitrations. The Securities Commissioner may base an investigation on a pattern of customer complaints or arbitration filings to determine if any enforcement action is warranted. In fact, Karsner is the perfect example of a situation in which the Securities Commissioner has initiated an investigation based upon a pattern of recommendations to his clients. As a result of that investigation, the Securities Commissioner has issued an Order to Show Cause in which she alleges that Karsner may have sold unsuitable investments and in other respects violated the Maryland Securities Act. *See* Exh. C attached to Frank Barlow affidavit, Exh 4. The expungement of Karsner's customer complaints or arbitrations from his CRD record will prevent the Securities Commissioner from considering relevant information, and impair her statutory obligation to investigate violations of the Maryland Securities Act.

In addition, the Securities Commissioner needs to be able to identify the broker-dealer firms that regularly hire brokers with histories of customer complaints, as perhaps warranting

closer review or examination of the sufficiency of supervision.  The Securities Commissioner

may base an investigation on a pattern of customer arbitration filings.

> C.    Denial of expungement and preservation in the CRD disciplinary
>        record of these facts is necessary for the Securities Commissioner
>        to comply with Maryland's public record laws.

As the principal executive officer of the Maryland Securities Division, the Securities

Commissioner is the "official custodian" of the Division's records and, as such, is responsible for

keeping the records of the Division.  Md. Code Ann., State Gov't, §10-611 (2004); Md. Code

Ann., Corps. and Ass'ns, §11-201.  Under Maryland law, a public record is defined to include

any documentary material that is received by a governmental unit or instrumentality in

connection with the transaction of public business.  State Gov't, §10-611.  That record may take

any form including, but not limited to, a computerized record such as the records maintained on

the CRD system.  *Id.*  The Securities Commissioner also is responsible for making those records

available to the general public.  *Id.*, §10-612.

As discussed above, to conduct securities business in Maryland, an individual is required

to apply for registration with the Maryland Securities Division as an agent by filing, via CRD, a

Form U4 with the Securities Commissioner.  That Form U4 requires the disclosure of certain

registration and disciplinary information, including customer complaints and arbitrations, which

forms the basis of the individual's application with the Securities Commissioner and factors into

the Securities Commissioner's decision whether to register that individual.  Under Maryland's

public records laws, the majority of the information contained on that Form U4, with the

exception of social security number and, at times, personal residential information, is a public

record.  Therefore, expungement of the arbitration will make it impossible for the Securities

Commissioner to comply with the public policy purposes behind Maryland's public records laws.

III.    <u>The Securities Commissioner should not be bound by the stipulated award.</u>

The Securities Commissioner was not a party to the underlying arbitration proceeding and did not agree to arbitrate the retention or destruction of her CRD records. In <u>Equal Employment Opportunity Commission v Waffle House, Inc.</u>, 534 US 279 (2002), the Supreme Court held that an agency enforcing a statute is not subject to a private arbitration agreement:

> No one asserts that the EEOC is a party to the contract, or that it agreed to arbitrate its claims. It goes without saying that a contract cannot bind a nonparty. Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so.

<u>Id.</u> at 293. The State's records relating to Karsner's registration in the State, likewise, should not be subject to the arbitration panel's recommendation of expungement.

IV.    <u>The arbitration panel did not award expungement but merely "recommended" expungement.</u>

The arbitration panel "recommended" the expungement of all reference to the arbitration from petitioner's CRD record: "[t]he Panel <u>recommends</u> the expungement of all reference to the above-captioned arbitration from Respondent Karsner's registration records maintained by the NASD Central Registration Depository. . ." The arbitration panel's recommendation should not be treated as the equivalent of an award of expungement. If the arbitration panel intended to award expungement of records, it very well could have done so by explicitly ordering or awarding expungement of the arbitration from Petitioner's CRD records.[5] The mere

---

[5]    In describing the circumstances under which the NASD will expunge customer dispute information from the CRD system under NASD Rule 2130, the NASD in Notice to Members 04-16 states the following: "If the parties settle the arbitration, they may jointly ask the arbitration panel for a stipulated award and request that the panel make affirmative findings and <u>order</u>

recommendation of expungement does not qualify as a final award under the FAA and, therefore, is not ripe for confirmation under §9 of the FAA.

CONCLUSION

WHEREFORE, for the reasons set forth above, the Securities Commissioner requests that the Petition to Confirm Arbitration Award be dismissed or, alternatively, that the Petition be denied. The Securities Commissioner also requests that a hearing be set in this matter.

Respectfully submitted,

Douglas F. Gansler
Attorney General of Maryland

_____/s/_____
Kelvin M. Blake
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-7783

_____/s/_____
Lucy Cardwell
Assistant Attorney General
Division of Securities
200 St. Paul Place, 25th Floor
Baltimore, MD 21202
410/576-6337

June 12, 2007

---

expungement based on one or more of the standards in Rule 2130."  The arbitration panel in this case did not "order" expungement but simply "recommended" expungement.

## CRD AGREEMENT

THIS AGREEMENT is made and entered into as of the second day of January, 1993, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

### WITNESSETH:

**WHEREAS,** state securities regulators have the regulatory authority under the laws of the United States and the state governments to license Broker-dealers, Agents and other securities professionals who operate within or from their jurisdictions; and

**WHEREAS,** NASAA and NASD (the "parties") entered into an agreement to create the Central Registration Depository (the "CRD"), which began operations in 1981, for the purpose of converting multiple paper-based Licensing and regulatory processes onto a single national computer system that facilitates state, self-regulatory organization and federal regulation of securities professionals (the "1980 Agreement"); and

**WHEREAS,** the parties wish to restate and replace that 1980 Agreement, as amended from time to time, with a new agreement to reflect the new relationship between the parties and the redevelopment of the CRD as specified in this agreement together with all Exhibits to be agreed upon by the parties and attached hereto and incorporated herein (the "CRD Agreement"); and

**WHEREAS,** through the development of the CRD, the parties have established a facility for the timely collection of Licensing fees required to be paid to state governments for the Licensing of Broker-dealers, Agents and other securities professionals and established a process to account for and distribute state Licensing fees to each participating government agency; and

**WHEREAS,** the parties acknowledge that, by virtue of the process established by the CRD for the sharing of Licensing information and the collection of Licensing fees to be paid to the state governments and the proper accounting for and distribution of those fees, state governments are third party beneficiaries of this CRD Agreement; and

**WHEREAS,** the parties are committed to the establishment of uniform procedures, definitions, and interpretations through cooperative efforts to promote observance of federal and

## Exhibit 1

4

investment adviser or investment adviser representative license, at such time, if any, when investment advisers and/or investment adviser representatives are included on the CRD.

2.04  **CRD Access Configuration (or CAC)** means the computer processors, software, firmware, leased lines facilities, network access ports, network routing facilities and such other data communications equipment as may be installed and maintained by the NASD for the purpose of connecting CRD Workstations and Printers to the central CRD system. The CAC permits connected CRD Workstations to transmit CRD transactions and receive responses and disseminated data and report files from the central CRD system.

2.05  **CRD Data** means the data filed with and maintained by CRD.

2.06  **CRD Printer** means an output device used by state staff to print out central CRD system-generated activity reports, rosters and database query responses. CRD printers are connected to the central CRD system via the CAC.

2.07  **CRD State** means any of the states of the United States, the District of Columbia, Puerto Rico and any of the United States territories and possessions, Mexico, and any of the provinces and territories of Canada that elects to implement its Licensing function through the CRD, provided that access to the central CRD system and software and hardware maintenance can be made available at reasonable cost, as determined by the parties, and is permissible pursuant to applicable government regulations.

2.08  **CRD Workstation** means a computer display device used by state staff to interactively access the central CRD system application. CRD workstations are connected to the central CRD system via the CAC.

# CRD AGREEMENT AMENDMENT

THIS AMENDMENT is made and entered into as of the _13th_ day of _December_ 1996, by and between the National Association of Securities Dealers, Inc. ("NASD"), 1735 K Street, N.W., Washington, D.C. 20006, and the North American Securities Administrators Association, Inc. ("NASAA"), One Massachusetts Avenue, N.W., Washington, D.C. 20001.

In consideration of the mutual promises of the parties, and the mutual agreements, covenants, and conditions hereinafter contained, it is hereby agreed as follows:

1.    The CRD Agreement entered into as of the second day of January, 1993, which terminated June 30, 1994, is hereby reinstated as of June 30, 1994, in all respects.

2.    The Initial Exhibits described at *Section 2.12* of the Agreement, and attached to this Amendment, are hereby accepted by the parties.

3.    The Agreement is further amended as follows:

   a.    The text of Section 2.04 is amended by the addition of the following sentence:

   Initial CAC specifications and material changes to CAC specifications shall be approved by the Steering Committee.

   b.    The following two sentences are added to Section 2.11:

   In the event of any conflict among the Exhibits between any two statements, the more specific statement shall prevail. Any disagreement in identifying the more specific statement shall be resolved by the Steering Committee.

   c.    The text of Section 2.16 is amended to replace the word "Kansas" with the words "Washington, D.C."

   d.    The text of Section 3.05(b) is deleted in its entirety and replaced by the following:

   The Steering Committee shall comprise persons appointed by NASAA and by NASD. Each party may name designees of the appointed persons. Each party shall designate one Steering Committee member as the party's delegate, who will, in voting matters, cast that party's vote.

   e.    The text of Section 3.10 (a) is deleted in its entirety and replaced by the following:

**Exhibit 2**

The data on CRD Uniform Forms filed with the CRD shall be deemed to have been filed with each CRD State in which the applicant seeks to be licensed and with the NASD and shall be the joint property of the applicant, NASD, and those CRD States (and, in the case of Forms BD and BDW, the Securities and Exchange Commission). The compilation constituting the CRD database as a whole shall be the property of NASD.

f.    The first sentence of Section 3.10(b) is deleted in its entirety and replaced by the following:

With the exception of paper forms sent to NASD for processing through the NASD's Internal Processing or Emergency Services Units, NASD shall maintain the original of any form not required to be filed electronically for a minimum of three (3) years from the date of filing.

g.    The second sentence of Section 3.14 is deleted in its entirety. The last sentence of the Section is deleted in its entirety and replaced by the following:

The Steering Committee shall approve all applications for substitute CACs and CAC attachments. NASD shall have sole authority for giving operational approval, which will not be withheld unreasonably.

h.    A new section 3.17 is added as follows:

NASD shall provide to NASAA access to CRD documentation related to this Agreement, provided reasonable advance notice has been given.

4.    In the event of a conflict between any term of the CRD Agreement and any term in this Amendment, the term in this Amendment shall prevail.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed by their duly authorized representatives.

NATIONAL ASSOCIATION OF          NORTH AMERICAN SECURITIES
SECURITIES DEALERS, INC.         ADMINISTRATORS ASSOCIATION, INC.

BY: _____      BY: _____
        (signature)                      (signature)
NAME: Frank J Formica            NAME: MARK GRIFFIN
        (print or type)                  (print or type)
TITLE: Vice-President            TITLE: President & Chair
        (print or type)                  (print or type)
DATE: 12/18/96                   DATE: 12/13/96

NASD OGC
NAME: ___
DATE: 12/10/96

10/25/1992  23:38    2027263797                EXHIBIT 3                    NASD ... ... ...    PAGE  02
                                                                           MU...E ...GION

# Stipulated Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:                      ARBITRATION
                                                               WASHINGTON, DC

Name of the Claimant                          Case Number: 04-07343
JoAnn Hinks

Names of the Respondents                      Hearing Site: Washington, DC
Legacy Financial Services, Inc.
Joseph R. Karsner, IV

---

Nature of the Dispute:  Customer vs. Member and Associated Person.

## REPRESENTATION OF PARTIES

Claimant, JoAnn Hinks ("Claimant"), hereinafter referred to as "Claimant", was represented by William B. Young, Esq., Hooper & Weiss, LLC, Orlando, Florida.

Respondents, Legacy Financial Services, Inc. ("Legacy") and Joseph R. Karsner, IV ("Karsner"), hereinafter collectively referred to as "Respondents", were represented by George S. Mahaffey, Jr., Esq. and Jeffrey J. Hines, Esq., Goodell, Devries, Leech & Dann, LLP, Baltimore, Maryland.

## CASE INFORMATION

Statement of Claim filed on or about October 19, 2004.
Claimant signed the Uniform Submission Agreement on October 19, 2004.
Claimant filed Response to Motion to Dismiss on February 21, 2005.
Claimant filed Amended Statement of Claim on March 29, 2005.

Statement of Answer and Motion to Dismiss filed by Respondents on February 8, 2005.
A representative of Respondent Legacy executed the Uniform Submission Agreement on January 13, 2005.
Respondent Karsner did not file a Uniform Submission Agreement with NASD Dispute Resolution.
Respondents filed Response to the Amended Statement of Claim on April 19, 2005.

## CASE SUMMARY

Claimant in her Statement of Claim and Amended Statement of Claim alleged that Respondents made unsuitable investment recommendations with regard to her accounts.

In their Statement of Answer and Motion to Dismiss, Respondents denied the allegation of wrongdoing set forth in the Statement of Claim and Amended Statement of Claim and asserted various affirmative defenses.

NASD Dispute Resolution
Arbitration No. 04-07343
Award  Page 2

## RELIEF REQUESTED

Claimant in her Statement of Claim requested:

| | |
|---|---|
| Compensatory Damages | $45,224.00 |
| Punitive Damages | amount unspecified |
| Interest | amount unspecified |
| Attorneys' Fees | amount unspecified |
| Other Costs | amount unspecified |

Respondents, in their Statement of Answer and Motion to Dismiss, requested that the Statement of Claim and Amended Statement of Claim be dismissed in their entirety and that the Arbitrator award them costs and attorneys' fees

## OTHER ISSUES CONSIDERED AND DECIDED

Respondent Karsner did not file with NASD Dispute Resolution, a properly executed submission to arbitration but is required to submit to arbitration pursuant to the Code and, having answered the claim, is bound by the determination of the Arbitrator on all issues submitted.

By Order dated September 20, 2005 the Arbitrator denied Respondents' Motion to Dismiss.

On or about April 26, 2006 the parties entered into an agreement to settle this matter on certain terms and conditions set forth in a confidential settlement agreement.

The parties have agreed that the Stipulated Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

The parties entered into an agreement to present to the Arbitrator a Stipulated Award. Upon motion of all parties for a Stipulated Award, as a result of information and documents obtained during the discovery process that all investments at issue were suitable and that the Respondents are not liable for any of the counts in the Statement of Claim and Amended Statement of Claim, the Arbitrator finds that the claims, allegations and information contained in the Statement of Claim and Amended Statement of Claim are clearly erroneous and that the Respondents were not involved in the alleged investment-related sales practice violations, and hereby grants the parties' motion and enters this award granting the following relief:

1. Pursuant to the confidential settlement agreement reached between the parties, all claims against Respondents are dismissed with prejudice;

2. The Arbitrator recommends the expungement of all reference to the above captioned arbitration from Respondent Karsner's registration records maintained by the NASD Central Registration Depository ("CRD"), with the understanding that pursuant to NASD

10/25/1992  23:38    2027263797                 MACHOME/MCLAREN                              PAGE    04

Notice to Members 04-16, Respondent Karsner must obtain confirmation from a court of competent jurisdiction before the CRD will execute the expungement directive.

Unless specifically waived in writing by the NASD, parties seeking judicial confirmation of an arbitration award containing expungement relief must name NASD as an additional party and serve NASD with all appropriate documents.

Pursuant to Rule 2130, the Arbitrator has made the following affirmative findings of fact:

The claim, allegation or information is factually impossible or clearly erroneous, and the registered person was not involved in the alleged investment-related sales practice violations.

3.  All claims for punitive damages and attorneys' fees are denied in their entirety;

4.  The parties shall bear their respective costs, including attorneys' fees, except as Fees are specifically addressed below; and

5.  Any and all relief not specifically addressed herein is denied in its entirety.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
Initial claim filing fee
= $   175.00

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person(s) at the time of the events giving rise to the dispute. Accordingly, Respondent **Legacy** is a party.

| | |
|---|---:|
| Member surcharge | = $   875.00 |
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $1,000.00 |
| Total Member Fees | = $2,625.00 |

### Forum Fees and Assessments
The Arbitrator has assessed forum fees for each session conducted.  A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less.  Fees associated with these proceedings are:

Two (2) Pre-hearing sessions with a single arbitrator @ $450.00          = $   900.00
Pre-hearing conferences:      May 12, 2005          1 session

NASD Dispute Resolution
Arbitration No. 04-07343
Award   Page 4

_____ September 9, 2005   1 session _____

Total Forum Fees                                               := $ 900.00

1. The Arbitrator has assessed $300.00 of the forum fees to Claimant.
2. The Arbitrator has assessed $300.00 of the forum fees to Respondent Legacy.
3. The Arbitrator has assessed $300.00 of the forum fees to Respondent Karsner.

## FEE SUMMARY

1. Claimant is assessed and shall pay the following fees:
   Initial Filing Fee                                          := $ 175.00
   Forum Fees                                                  := $ 300.00
   Retained Hearing Session Deposit                            := $ 150.00
   Total Fees                                                  := $ 625.00
   Less payments                                               := $ 625.00
   Balance Due NASD Dispute Resolution                         := $  00.00

2. Respondent Legacy is assessed and shall pay the following fees:
   Member Fees                                                 := $2,625.00
   Forum Fees                                                  := $ 300.00
   Total Fees                                                  := $2,925.00
   Less payments                                               := $2,625.00
   Balance Due NASD Dispute Resolution                         := $ 300.00

3. Respondent Karsner is assessed and shall pay the following fees:
   Forum Fees                                                  := $ 300.00
   Total Fees                                                  := $ 300.00
   Less payments                                               := $  00.00
   Balance Due NASD Dispute Resolution                         := $ 300.00

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule
10330(g) of the Code.

## SOLE ARBITRTATOR

Douglas Earl McLaren, Esq.              -     Sole Public Arbitrator

NASD Dispute Resolution
Arbitration No. 04-07343
Award   Page 5

**Sole Arbitrator's Signature**

Douglas Earl McLaren, Esq.
Public Arbitrator, Presiding Chairperson

6/5/06
Signature Date

6/5/6
Date of Service  (For NASD Dispute Resolution office use only)

# EXHIBIT 4

## AFFIDAVIT OF FRANK G. BARLOW

I, FRANK G. BARLOW, make this affidavit under penalties of perjury:

1.      I am a resident of Baltimore County, Maryland and am over twenty-one years of age. I make this affidavit based on my personal knowledge.

2.      I am an investigator with the Maryland Securities Division ("Division").

3.      I have reviewed documents from the Central Registration Depository ("CRD") to identify the records that Joseph R. Karsner, IV seeks to expunge in this matter. I have printed, and attach as Exhibit A, the CRD records disclosing an arbitration complaint filed by Joann Hinks, in NASD arbitration case 04-07343.

4.      I have also reviewed documents from the CRD for current and archived disclosure information on other complaints and arbitrations that have been filed against Joseph R. Karsner, IV. I attach as Exhibit B a schedule summarizing the disclosure information for the arbitration complaints filed against Karsner.

5.      On March 19, 2007, the Maryland Securities Commissioner issued an Order to Show Cause against Joseph R. Karsner, IV, Joe Karsner & Associates and Legacy Financial Services alleging violations of the Maryland Securities Act, including violations of the anti-fraud and investment adviser registration provisions. I attach the order as Exhibit C.


Dated: June 12, 2007                              /s/

                                                  Franklin G. Barlow

**NASD**

Rev. Form U6 (06/2003)

## U6 – ARBITRATION DRP

This Disclosure Reporting Page is an ⦿ **INITIAL OR** ○ **AMENDED**

### SRO Arbitration/Reparation

1. Case Name:
   JOANN HINKS V. LEGACY FINANCIAL SERVICES, INC., JOSEPH R. KARSNER, IV

2. Arbitration/Reparation filed with:
   NASD

3. Date case was initiated (MM/DD/YYYY):
   10/19/2004

4. Case Number:
   04-07343

5. Employing Firm when events occurred which led to the arbitration/reparation:
   LEGACY FINANCIAL SERVICES, INC.,

6. Allegation(s):
   UNSUITABLE INVESTMETN RECOMMENDATIONS

7. Principal Product Type:
   Other
   Other Product Types:
   UNSPECIFIES SECURITIES

8. Alleged Compensatory Damage Amount:
   $ 45,224.00

9. Is arbitration/reparation currently pending? ○ **Yes** ⦿ **No**

   If No, how was arbitration/reparation resolved?
   Other

   Resolution Date (MM/DD/YYYY):
   06/05/2006

10. Disposition details:
    STIPULATED AWARD ISSUED: THE PARTIES ENTERED INTO AN AGREEMENT TO SETTLE THIS MATTER;
    PURSUANT TO THE SETTLEMENT AGREEMENT REACHED BETWEEN THE PARTIES, ALL CLAIMS AGAINST
    RESPONDENTS ARE DISMISSED WITH PREJUDICE.

---

**U5 – AMENDMENT**
**07/12/2006**
**LEGACY FINANCIAL SERVICES, INC. (38697)**

Rev. Form U5 (10/2005)

### CUSTOMER COMPLAINT/Arbitration/Civil Litigation DRP

This Disclosure Reporting Page is an ⦿ **INITIAL OR** ○ **AMENDED** response to report details for affirmative
responses to **Questions 7(E)(1), 7(E)(2) and 7(E)(3)** on Form U5;

**Check question(s) you are responding to:**

### Customer Complaint/Arbitration/Civil Litigation

| ☐**7(E)(1)(a)** | ☐**7(E)(1)(b)** | ☑**7(E)(1)(c)** | ☐**7(E)(2)** | ☐**7(E)(3)(a)** | ☐**7(E)(3)(b)** |

One event may result in more than one affirmative answer to the above items. Use only one *DRP to report details* related to one customer complaint/arbitration/civil litigation. Use a separate DRP for each customer complaint/arbitration/civil litigation.

DRP Instructions:
- In all matters (i.e., customer complaints, arbitrations/CFTC reparations, civil litigations), complete items 1-6.
- If the matter involves only a customer complaint, also complete items 7-12, as appropriate.
- If the customer complaint has evolved into an arbitration/CFTC reparation or civil litigation, amend the existing DRP by completing items 9 and 10.
- If the matter involves an arbitration or CFTC reparation, complete items 13-19, as appropriate.
- If the matter involves a civil litigation, complete items 20-27.
- Item 28 is an optional field and applies to all event types (i.e., customer complaint, arbitration/CFTC reparation/civil litigation).

Complete items 1-6 for all events.

| | |
|---|---|
| 1. | Customer Name(s):<br>JOANN HINKS |
| 2. | Customer(s) State of Residence:<br>Maryland<br>Other state(s) of residence/detail: |
| 3. | Employing *Firm* when activities occurred which led to the complaint:<br>LEGACY FINANCIAL SERVICES, INC. |
| 4. | Allegation(s) and a brief summary of events related to the allegation(s) including dates when activities leading to the allegation(s) occurred:<br>CLIENT ALLEGED THAT ADVISOR MISMANAGED MONEY. |
| 5. | Principal Product Type:<br>Mutual Fund(s)<br>Other Product Types: |
| 6. | Alleged Compensatory Damage Amount:          $ 52,524.00 |

**If the matter involves only a customer complaint, complete items 7-12, as appropriate.**

7. Date Customer Complaint was received (MM/DD/YYYY):

03/26/2004 ⦿ **Exact**   ○ **Explanation**

If not exact, provide explanation:

8. Is the customer complaint pending? ○ **Yes**   ⦿ **No**

**If the customer complaint has evolved into an arbitration/CFTC reparation or civil litigation, amend the existing DRP by completing items 9 and 10.**

9. If the customer complaint is not pending, provide status:
If status is settlement, complete items 11 and 12;
If status is arbitration/reparation, complete items 13-19;
If status is litigation, complete items 20-27.

☐ **Closed/No Action**      ☐ **Withdrawn**      ☐ **Denied**
☐ **Settled**      ☑ **Arbitration/Reparation**      ☐ **Litigation**

10. Status Date (MM/DD/YYYY):

12/22/2004 ⦿ **Exact**   ○ **Explanation**

If not exact, provide explanation:

11. Settlement amount (if settled without arbitration, litigation or reparation):    $

12. Individual Contribution Amount:    $

**If the matter involves an arbitration or CFTC reparation, complete items 13-19, as appropriate.**

13. Arbitration/Reparation claim filed with (NASD, AAA, NYSE, CBOE, CFTC, etc.) and Docket/Case Number:
    NASD ARBITRATION #04-07343

14. Date notice/process was served (MM/DD/YYYY):
    12/22/2004  ⦿ **Exact**  ○ **Explanation**
    If not exact, provide explanation:

15. Is the arbitration/reparation pending?  ○ **Yes**  ⦿ **No**

16. If the arbitration/reparation is not pending, what was the disposition?
    Settled

17. Disposition Date (MM/DD/YYYY):
    04/14/2006  ⦿ **Exact**  ○ **Explanation**
    If not exact, provide explanation:

18. Amount of Monetary Compensation (award, settlement, reparation    $ 25,000.00
    amount):

19. Individual Contribution Amount:    $ 0.00

**If the matter involves a civil litigation, complete items 20-27.**

20. Court that case was filed in (include name of Federal, Military, State or Foreign Court, Location of Court - City
    or County and State or Country, Docket/Case number).

21. Date notice/process was served (MM/DD/YYYY):
    ○ **Exact**  ○ **Explanation**
    If not exact, provide explanation:

22. Is the civil litigation pending?  ○ **Yes**  ○ **No**

23. If the civil litigation is not pending, what was the disposition?

24. Disposition Date (MM/DD/YYYY):
    ○ **Exact**  ○ **Explanation**
    If not exact, provide explanation:

25. Amount of Monetary Compensation (judgment, restitution, settlement    $
    amount):

26. Individual Contribution Amount:    $

27. If the action is currently on appeal enter date appeal filed (MM/DD/YYYY):
    ○ **Exact**  ○ **Explanation**
    If not exact, provide explanation:

28. **Comment (Optional).** You may use this field to provide a brief summary of the circumstances leading to the customer complaint, arbitration/CFTC reparation and/or civil litigation as well as the current status or final disposition(s). Your information must fit within the space provided.

Joseph Karsner CRD Entries

# EXHIBIT B

| Complainant | Date of court filing | Date of award | $ Resolution | $damages sought | Allegations and Comments | State of residence |
|---|---|---|---|---|---|---|
| Lothian, Pamela NASD 04-07347 | 2/12/07 | 1/23/06 | $47,000 | $104,638 | Mismanged funds. Expungement. | MD |
| Simpson, Larry 04-05824 | 2/21/07 | 1/6/06 | $16,000 | $124,000 | Misrepresentations. Expungement. | MD |
| L, Douglas 05-04816 | | 3/12/07 | $36,000 | $200,000 | unsuitable investments | PA |
| T, Cheryl 04-07344 | | 2/13/06 | $35,000 | $80,000 | unsuitable investments | PA |
| P, Anthony 04-08295 | | 6/14/06 | $22,500 | $136,500 | unsuitable investments | MD |
| L, Mary 04-08457 | | 3/7/06 | dismissed | $88,000 | unsuitable investments | MD |
| H, Mattie 04-08341 | | 9/7/06 | $75,000 | $188,000 | unsuitable investments | MD |
| D, Ronald 05-00275 | | 9/7/06 | $75,000 | $218,000 | unsuitable investment advice | MD |
| M, Denise 04-07359 | | 11/2/06 | $31,000 | $64,239 | unsuitable investments | OH |
| C, Robert 04-06068 | | 8/7/06 | $22,500 | $134,383.87 | misrepresentation, fraudulent inducement | MD |
| E, Carolyn 06-02026 | | 1/8/07 | settled, amount unknown | $500,000 | unsuitable investments. Settled and complaint withdrawn, claims dismissed; no payment. | VA |
| M, William 05-04984 | | 3/7/07 | $27,000 | $250,500 | unsuitable investments, misrepresentations | PA |
| J, Warren 05-00940 | | 10/25/06 | $24,000 | $90,352 | unsuitable investments | VA |
| H, Virgie 04-08296 | | 6/22/06 | $15,000 | $28,240 | unsuitable investments | MD |

| | | | | | | |
|---|---|---|---|---|---|---|
| H, Mary 04-0736 | | 6/16/06 | $29,000 | $88,000 | mismanagement of funds. | FL |
| L, Shirley 04-06796 | | 9/11/06 | $31,000 | $66,029 | misrepresentations | NC |
| B, Beverly 04-06795 | | 6/16/06 | $35,000 | $184,000 | misrepresentations | MD |
| W, Robert 04-06266 | | 6/22/06 | $30,000 | $105,500 | misrepresentations | VA |
| B, Donna 04-06404 | | 6/16/06 | $25,000 | $80,000 | misrepresentations & unsuitability | MD |
| H, Terressa 04-06007 | | 11/1/06 | $92,500 | $264,000 | mishandled acct; failure to supervise | MD |
| Catalano, John 04-05933 | 3/15/07 | 2/13/06 | $15,000 | $134,000 | high risk accts. $15,000 contingent on stip to expungement. If no stip award granting expungement, $9,999. | MD |
| P, James 04-05943 | | 6/12/06 | $25,500 | $198,000 | high risk accts. unsuitable investments | MD |
| H, Joann 04-07343 | | 4/14/06 | $25,000 | $52,524 | mismanaged money unsuitable investments | MD |
| G, Diane 04-07345 | | 6/22/06 | $16,500 | $52,843 (letter) $$36,400 (arb.) | mismanaged money | MD |
| J, Kathleen 04-08561 | | 7/25/06 | $17,500 | $30,000 (letter) $54,523 (arb.) | mismanaged money | MD |
| T, Eleanor 03-03410 | | 5/12/05 | denied (archived) | $186,753.26 | unsuitable investments, misrepresentations | VA |
| R, Roland & Linda 04-06039 | | 11/3/05 | $265,000 | $500,000 | misrepresentation, mismanaged accts, violations of Act. Karsner contributed $50,000. | MD |

2

| | | | | | | |
|---|---|---|---|---|---|---|
| P, Michael 04-06176DC | | 9/12/05 | dismissed (archived) | $30,000 | unsuitability and misrepresentation | MD |
| E, Elizabeth 01-05011 | | 12/23/02 | $60,000 | $80,000 | improper management of account causing adverse tax consequences. Karsner contributed $5,000. | MD |
| B, Eva 05-00627 | | 7/22/05 | dismissed (archived) | $70,000 | unsuitable investments | WA |
| C, Douglas 02-07048 | | 2/11/04 | $105,000 (award) | $278,000 | misrepresentation and fraud. Karsner contributed $5,000. | MD |
| T, Joseph 04-05940 | | | pending | $119,000 | misappropriation in high risk investments | MD |
| Total | | | $1,198,000 | | | |

## EXHIBIT C

ADMINISTRATIVE PROCEEDING
BEFORE THE
MARYLAND SECURITIES COMMISSIONER

| | |
|---|---|
| IN THE MATTER OF: | * |
| JOSEPH R. KARSNER, IV, | *   File No. 2002-0391 |
| JOE KARSNER & ASSOCIATES, LLC | * |
| and | * |
| LEGACY FINANCIAL SERVICES, INC., | * |
| Respondents. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER TO SHOW CAUSE

WHEREAS, the Maryland Securities Commissioner (the "Commissioner"), pursuant to the authority granted by Section 11-701 of the Maryland Securities Act, Corporations and Associations Article, Title 11, Annotated Code of Maryland (1999 Repl. Vol. & 2006 Supp.) (the "Securities Act") initiated an investigation into the activities of Joseph R. Karsner, IV ("Karsner"), a registered representative of Legacy Financial Services, Inc. ("Legacy"), and of Karsner's sole proprietorship Joe Karsner & Associates, LLC ("JK & A"); and

WHEREAS, in the course of its investigation of Karsner, the Maryland Securities Division ("Division") pursued an investigation of Legacy's supervisory practices; and

WHEREAS, on the basis of that investigation the Commissioner has determined that respondent Karsner and JK & A may have sold unsuitable investments to his clients and in other respects violated the Securities Act, and that respondent Legacy may have failed adequately to supervise Karsner; and

NOW, THEREFORE, the Commissioner hereby orders respondents to show cause: why respondents should not be barred from engaging in the securities and investment advisory business in this State; why a civil monetary penalty should not be entered against each respondent; why a final order should not be entered ordering respondents to cease and desist from further violations of the Securities Act; and why respondents' registrations as broker-dealer and broker-dealer agent should not be suspended or revoked.

The Commissioner alleges the following as a basis for this Order:

## I. JURISDICTION

1.    The Commissioner has jurisdiction in this proceeding pursuant to Section 11-701.1 of the Securities Act.

## II. RESPONDENTS

2.    Karsner (CRD # 1001341) is a Maryland resident and maintains a place of business at 325 Gambrills Road, Suite B, Gambrills, Maryland 21054.  Karsner became a registered representative of Legacy on April 2, 1999, but was terminated on January 5, 2006.  He was registered through Signator Investors, Inc. (a.k.a. John Hancock Distributors, Inc.), an affiliate of John Hancock Life Insurance Company (collectively "Hancock"), between November 1981 and April 1999.  He has passed the Series 6 exam and, therefore, may be licensed to sell mutual funds, but has never passed the Series 7 exam that would permit him to become a general securities representative.  He is not registered as an investment adviser representative, but is a licensed insurance agent in Maryland.  He is not currently registered to sell securities in any jurisdiction.

3.    Joe Karsner & Associates, LLC is a Maryland limited liability company formed in

2

April 1999. Its principal office is located at 325 Gambrills Road, Suite B, Gambrills, Maryland 21054.

    4.    Legacy (CRD # 38697) is a California corporation organized in 1995. It is headquartered at 2090 Marina Avenue, Box 6030, Petaluma, CA 94955-6030. Legacy has been registered as a broker-dealer with the National Association of Securities Dealers, Inc. ("NASD") since December 1995 and in Maryland since January 1996.

## III. STATEMENT OF FACTS

Karsner's Business Practices

    5.    Karsner operated a branch office of Legacy between September 23, 2002 and January 5, 2006, when he was terminated. Between April 2, 1999 and September 23, 2002, his office was an offsite location of Legacy.

    6.    Karsner described his business "Joe Karsner and Associates" as a "retirement planning and investment organization that offers a number of investment vehicles to structure a portfolio that will meet your particular financial needs." He explained on his website provenretirement.com that he has "over 22 years experience in the retirement/investment/ insurance financial planning field."

    7.    Karsner held out to the public as an investment adviser. His website used to describe Karsner as a "financial advisor." While he was affiliated with Legacy, the website stated that he "manages over $250 million in retirement accounts." It described Karsner's Proven Retirement Solution's twelve-step, three stage process, including the first stage in which he helped clients assess their current circumstances and set financial goals; the second stage in which he developed a retirement plan that would fit clients' particular situations; and the third

stage in which he implemented the retirement plan with investment products that would help achieve the clients' life-long goals.

8.    Karsner emphasized to his clients his close and continuing relationship. In effect, he assumed a continuing fiduciary duty to his clients. He regularly updated clients on the status of their accounts by sending them investment summaries. He also sent letters providing his analysis of the financial markets. He reiterated in these letters his continuing responsibility for his clients with such assurances as "my business has been built soley [sic] on the premise of establishing and maintaining long-term relationships with each and every one of you," "I will continue to work hard in getting you the returns you deserve," and "call us if you would like to set up an appointment to review your accounts or reassess your financial needs. I remain committed to taking care of you the way you deserve."

9.    Karsner's website posting explained that "under the guidance of our Broker/Dealer, Legacy Financial in Petaluma, CA, Joe Karsner and Associates is able to offer superior financial products and services." According to the website, Karsner had several others working with the firm of Joe Karsner and Associates.

10.    Up until at least May 23, 2003, Karsner described Rita Hampton ("Hampton") (CRD #2999338) as one of his Legacy staff members who "has worked in the investment/insurance business for over 17 years." Hampton, however, was not a registered representative of Legacy at that time. She was registered through Lifemark Securities Corp. ("Lifemark") from January 1998 until April 2002 and through Atlas Brokerage Company ("Atlas") from April 2002 until December 2002 and again from February 2003 until October 2003. She did not become registered in Maryland through Legacy until February 3, 2004. She

4

used business cards showing her affiliation with Joe Karsner & Associates providing "Investments & Insurance for Retirement Planning" and serving as a vice president, but not identifying any broker-dealer.

11.    While Hampton was registered first through Lifemark and then Atlas, she routinely assisted Karsner with his Legacy securities clients by accompanying Karsner to meet with clients and talking with them on the telephone. Sometimes, Hampton met with Legacy securities clients alone. For example, Shirley Locklair met *only* with Hampton, but signed a Legacy new account form ("NAF") and received statements from Karsner. Karsner included on client statements insurance products from companies where Hampton, but not Karsner, had appointments. Karsner advised his clients to talk with Hampton if they had questions. Hampton also wrote some Legacy clients concerning their Legacy investments.

12.    With the assistance of Hampton and the rest of his staff, Karsner handled more than eleven hundred clients as of June 2003. He earned more than $3.3 million in commissions between April 2,1999 and June 5, 2003.

13.    Legacy paid Karsner a $125,000 signing bonus when he joined the firm. In exchange, Karsner agreed to provide Legacy with written confirmation from Hancock of its intention to transfer all customers and their invested capital to Legacy.

14.    When Karsner moved from Hancock to Legacy, Legacy arranged for a mass transfer of Karsner's clients. Clients did not individually request or authorize this transfer. Rather, the transfer was handled between the firms in about April 1999. On June 1, 1999, when Karsner expected the transfer to be complete, he wrote clients informing them that their accounts were being transferred to his new firm and asking them to advise him if a Hancock representative

should get in touch with them.

15.    Many of Karsner's clients are employees and former employees of the "telephone company," whether AT&T, Bell Atlantic or Verizon. Karsner holds or held seminars, sometimes on telephone company premises, targeting telephone company employees planning for retirement. He typically advised persons attending his seminars who were eligible for retirement to take a lump sum distribution rather than a guaranteed monthly pension because the lump sum distribution could provide for income as well as growth. He recommended that retirees invest the lump sum in a portfolio of mutual funds, variable annuities and other insurance products, and assured potential clients that they would be able to live off the investment income from their lump sum distribution for the rest of their lives.

16.    Karsner routinely gave seminar participants a packet of materials that would help them calculate the payments they could expect to obtain from their retirement portfolio. The materials contained a formula for calculating sustainable annual withdrawals, depending upon the size of the retirement distribution, the individual's age, life expectancy and estimated annual investment return. The packet included a selection of investment returns ranging from a low of 6% to a high of 12%. In the specific example that Karsner generally gave seminar participants, however, the estimated annual investment return was 8%. In some cases, Karsner handed out materials in which he guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account. The seminar materials contain no other discussion of the risks associated with the estimated return.

17.    When clients told Karsner how much income they needed or wanted to withdraw per month, he routinely assured them that he could provide that income. He did not discuss the

risks associated with obtaining higher levels of monthly income and assured them that they would be able to live on their principal and income until they died. In reliance on Karsner's reassurances, many of the seminar participants retired while still in their 50s, expecting to be able to live on the regular monthly income drawn from their retirement accounts managed by Karsner.

18.    Karsner explained the tax consequences of his retirement advice. He told his clients that if they withdrew regular income from their retirement accounts before the age of 59 ½ and complied with the provisions of Section 72(t) of the Internal Revenue Code, they would not suffer tax penalties. IRC Section 72(t) provides that a taxpayer must pay a 10% penalty for any distributions taken from a qualified retirement plan before the age of 59 ½ unless the distributions are part of a series of substantially equal periodic payments. Clients who relied upon IRC Section 72(t) were locked into their monthly withdrawals until the IRS modified the rules in October 2002 to allow for a one-time change to the distribution method.

19.    Internal Revenue Rulings implementing IRC Section 72(t) provide that the interest rate used to calculate the maximum permissible periodic payment be no more than 120% of the federal mid-term rate determined in accordance in § 1274(d). During the period after Karsner moved his business to Legacy, that rate could not exceed 6.35%. Karsner's sample calculation for the periodic payment, however, used a rate of 8%.

20.    Karsner generally advised his clients to purchase several mutual funds and to reserve a part of their portfolio in a money market account that could be used to fund regular monthly withdrawals, satisfying the requirements of IRC Section 72(t).

21.    Most of his clients were unsophisticated in financial matters and relied upon Karsner to make diversified investments in their accounts which would be safe and secure.

7

While Karsner was with Hancock, his client accounts were generally fairly conservatively invested in a diversified portfolio of mutual funds, including such funds as growth and income, large cap growth, bank and bond funds, and variable annuities with diversified mutual fund sub-accounts.

22.     When Karsner transferred from Hancock to Legacy in April 1999 and his clients were transferred to Legacy through a mass transfer, Karsner was unable to service the client accounts through Legacy because the accounts held proprietary Hancock products.  It took some time for Karsner to meet with his approximately 1000 clients after his move.  As he met with them, he advised his clients to sell the Hancock products and purchase products through Legacy.

23.     Karsner pursued a much riskier investment strategy after he joined Legacy. Karsner followed investment strategies that resulted in significant portions of client assets at Legacy being invested in technology, telecommunications, internet and small or medium cap growth funds.  As a result, clients' portfolios were invested in far riskier funds than they had been at Hancock.

24.     For example, in March 2000, Karsner instructed Hancock to change the mutual funds held in the sub-accounts of over 350 variable annuity clients from a diversified portfolio to a single sub-account holding a mid-cap fund.  He did not consult with clients before directing this transfer and did not have discretionary authority over the accounts.

25.     Karsner switched many other clients from Hancock mutual funds to Oppenheimer or American Skandia/Janus funds after he moved to Legacy.  When he met with clients to make these recommendations, he also had the clients sign Legacy new account forms, often changing the investment objectives and risk tolerance from their Hancock forms to coincide with the

8

characteristics of the riskier portfolios.

26.    Many of the mutual funds that Karsner recommended to his clients declined very substantially with the burst of the tech bubble beginning in the spring of 2000, frequently by significantly more than the S & P 500 because of their investments in risky securities and concentration in small to mid-cap firms and technology stock.

27.    After his clients' portfolios had substantially declined, Karsner sometimes advised clients to sell their homes, take in tenants, go back to work or stop drawing income. Indeed, many clients have been forced to return to work. This advice was in sharp contrast to his advice when they first came to him with their retirement funds and he assured them that they could live off the proceeds for the rest of their lives.

28.    Because Karsner's clients are generally retired from the telephone company and often were taking regular income withdrawals pursuant to IRC Section 72(t), they were locked into taking withdrawals even if the withdrawals came out of principal rather than stock appreciation and investment income. As a result of following Karsner's investment advice, the retirement portfolios for many of these clients have been decimated. For example, Roland and Linda R. invested about $840,000, withdrew about $242,400, and ended with about $302,000 as of August 2003, for an approximately 50% loss of their net investment.

29.    When clients questioned Karsner about the decline in their portfolios, he advised them not to sell because their losses were simply paper losses and they still held the shares. Even as their account balances were dwindling, Karsner sent letters to clients attributing the decline to September 11 and telling them to hold onto their funds because they were invested for the long run. In recognition of his bad investment advice, however, Karsner told clients that he would

9

rebalance their portfolios after fund prices returned to target levels. For example, he wrote one client that, when fund prices reached target levels, he would place half his Janus Capital Growth shares into American Century Strategic Balanced Fund, half the Oppenheimer MidCap Fund into Quest Balanced Value Fund and half the Neuberger Berman MidCap Fund into Pimco Total Return Bond Fund.

30.     Many of the mutual funds purchased on Karsner's advice were unsuitable. His strategy of investing in risky growth and small or mid cap funds was often devastating to retirees without a source of employment income. The bitter result was often that clients lost a substantial part or even the entire value of their retirement portfolios.

31.     NAFs are designed to provide guidance to a broker-dealer and its representatives for deciding which investments to recommend to customers. Legacy's NAFs require background financial information that "must be completed for all accounts." One section requests the client's net assets and income; a second asks the client to check all applicable investment objectives; and a third asks whether the client's risk tolerance is high, medium or low. Hancock's NAF contains a similar list of possible investment objectives, including safety of principal. The NAF should form the basis for Karsner's recommendations to his clients and allow Legacy to review those recommendations for suitability.

32.     Many of Karsner's clients have multiple NAFs with inconsistent objectives or risk tolerance. Sometimes, clients have more than one NAF with different objectives or risk tolerance on the same day.

33.     Karsner appears to have completed the NAF sections showing the clients' risk tolerance and investment objectives. Many clients claim that they never discussed with him their

willingness to expose their retirement funds to risk. Sometimes, the risk tolerance or investment objectives section of the NAF is blank. Where there are two NAFs on the same date, with one partly blank, it appears that Karsner may have completed the form after the client signed. Other times, the client signatures appear to have been forged or copied.

34.    Karsner had a practice of having his clients sign a new account form for each new investment product. In effect, he made sure that the investment objectives and risk tolerance in the new account form were consistent with the investment product that he sold, rather than with the client's overall investment objectives and risk tolerance.

35.    Many client NAFs have not been approved or signed by a Legacy supervisor. It appears that, even when a supervisor signed the form, Legacy did not question why Karsner's clients signed so many NAFs within a short period of time or even on the same day, why the clients' risk profiles and investment objectives changed, and whether the risk profiles were appropriate for clients' retirement funds.

36.    Many investment applications completed when clients switched from one mutual fund to another are, also, incomplete. Clients did not always sign the applications or initial required items of disclosure. Often, sections were completed by typewriter before the client saw the application.

37.    Karsner routinely told his clients that they paid no fees because of the large volume of his business. Seminar materials state "no sales charges on either front or back end." When clients sold interests in mutual funds, however, they sometimes incurred contingent deferred sales charges on the sale of their Class B mutual funds.

38.    Karsner reimbursed some clients when they incurred unexpected fees. For

11

example, he reimbursed clients for various "administrative" fees, sales commissions or deferred sales charges. He reimbursed Elizabeth E. about $8,000 for unanticipated taxes, Helen and John A. for $2,500 in taxes resulting from an unauthorized transaction, and Vergie H. $23,000 for an unauthorized transaction. Karsner warned these clients not to talk with anyone else about the reimbursements.

<u>Legacy's Supervisory Procedures</u>

39.    Larry Qvistgaard, Vice President and Chief Compliance Officer of Legacy, supervised Karsner. According to CRD, he supervised Karsner's branch office until it officially closed on March 3, 2006. During the period April 2, 1999 through June 2002, Qvistgaard supervised approximately 103 registered representatives who had approximately 4,124 clients. Karsner alone had more than 1,000 clients. Qvistgaard had about 159 clients of his own.

40.    Qvistgaard, who served both as Chief Compliance Officer and as line supervisor for over 100 representatives, could not adequately supervise those for whom he was responsible while simultaneously ensuring that Legacy's supervisory procedures were adequate and properly implemented.

41.    According to Legacy, Karsner's office was not subject to an annual audit because it is a branch office. Legacy's Compliance Manual required that branch offices be audited at least every three years, but may be subject to more frequent inspections should the Office of Supervisory Jurisdiction become aware of anything that would warrant an inspection. Non-branch offices must be inspected as required by state law.

42.    Legacy has an obligation to monitor the securities-related activities of its agents and to detect and prevent regulatory and compliance problems of its associated persons, whether

12

the persons are working at branch or unregistered offices.  In order to fulfill these obligations, Legacy must conduct periodic examinations of its agents' offices depending on such factors as the nature and volume of business conducted at the office and the nature and extent of contact with customers.

43.    The NASD Notice to Members 98-38 advises its members that it does not distinguish between branch offices and unregistered offices in its evaluation of the adequacy of compliance examinations and notes that a pre-announced compliance examination only once a year was inadequate to satisfy supervisory obligations of broker-dealer Royal Alliance.

44.    It appears that Legacy's first inspection of Karsner's office took place on December 3, 2001, more than two years after Karsner started with Legacy and before his office became a branch office.  At that time, Qvistgaard conducted a two-hour audit of Karsner's office. The audit showed that Karsner conducted no seminars, although he had a history of soliciting clients through seminars, and made no deposits to client accounts, although Elizabeth E. filed a complaint before September 1, 2001, in which she alleged that Karsner had reimbursed her for the tax consequences of an improper trade.  The audit also stated that outgoing correspondence was sent to Legacy's compliance department, although correspondence from Karsner to his clients shows that Hampton engaged in securities activities on behalf of Legacy without being registered through Legacy.  The audit did not comment on the role played by Hampton in Joe Karsner & Associates, although Linda M. had complained in May 2001 about transactions allegedly executed by Hampton when she had dealt only with Karsner.

45.    Even though there had been numerous customer complaints and an active investigation by the Securities Division, Legacy did not audit Karsner's office again until July 1,

2003. The audit was announced. At that time, the auditor identified Qvistgaard as OSJ Manager and Karsner's office as a non-branch office, in spite of a branch office designation on CRD. The auditor noted that Karsner solicits customers through seminars and stated that Legacy has approved all Karsner's correspondence, seminar material and website. He also stated that Karsner had made no deposits to client accounts, but inconsistently noted the settlement of Elizabeth E.'s claim alleging that Karsner reimbursed her for taxes and rebated fees to other clients. The audit did not comment on any review of Karsner's bank records or on the role played by Hampton in Joe Karsner & Associates.

46.     Legacy did not maintain books and records that were adequate to properly supervise Karsner. It did not have records of the clients' portfolios brought over to Legacy from Hancock and could not determine whether there was a change in the riskiness of the portfolios when Karsner switched the clients from their proprietary Hancock products into other mutual funds. It did not maintain any computerized records of client portfolios or other records providing a statement of client accounts after Karsner switched the mutual fund holdings. Therefore, it could not evaluate the suitability of client investments. It had only the disclosure documents that Karsner completed and clients were supposed to sign when they purchased mutual funds. Often these forms were incomplete, unreviewed by supervisors and unsigned by the clients.

47.     Legacy's Compliance and Procedures Manual and OSJ Branch Office Policy and Procedures Manual prohibit various of Karsner's sales practices. For example, they require that:

a.     NAFs be completed in their entirety;

b.     Mutual fund applications be complete;

14

c.      Registered representatives recommend switching of mutual fund families only in rare circumstances where there has been a clear change in the customer's investment objective and the investment objective of the new investment clearly meets the changed investment objective.

d.      Registered representatives not guarantee the future value of any security;

e.      All correspondence or other materials mailed or handed out at seminars to customers be approved;

f.      Registered representatives not make gifts in excess of $100 to any customer; and

g.      When a registered representative changes his broker-dealer registration to Legacy, the client complete and sign a change of broker-dealer form and the form be forwarded to Legacy together with a NAF.

48.     Legacy's OSJ Branch Office Policy and Procedures Manual spells out supervisory procedures that Legacy has not met or for which proof of implementation has not been provided to the Securities Division:

a.      NAFs must be reviewed for completeness;

b.      NAFs must be signed by the OSJ Branch Manager;

c.      Mutual fund applications must be reviewed for completeness;

d.      All office personnel in a small office must be fingerprinted;

e.      All correspondence by a registered representative must be approved;

f.      All seminar material used by a registered representative must be approved;

g.      A registered representative's personal bank disbursements must be reviewed to determine whether there have been checks payable to customers;

15

h.     All mutual fund liquidations must be reviewed to determine whether subsequent investments are suitable and whether appropriate disclosures, including switching letters, have been made; and

i.     All clients must complete and sign a change of broker-dealer form when a registered representative changes his broker-dealer registration to Legacy.

49.     Legacy was on notice at least since 2001 that Karsner worked with Hampton on securities matters and yet Legacy did not supervise her. Karsner client Linda M. complained that Karsner sold her an annuity but that paperwork reflecting the transaction was executed by Hampton, whom the client did not know. In addition, in a letter dated December 17, 2001, Legacy's Compliance Director recognized that client Shirley L. "met with Rita Hampton, an associate of Joe Karsner, to discuss your investments because you saw a decrease in your investment." Yet Legacy took no action to ensure that Hampton stopped conducting business on behalf of Legacy or to supervise Hampton until February 2004, when Legacy hired Hampton as an agent.

50.     Legacy was on notice since no later than December 2001, that clients sometimes had multiple NAFs on the same date with contradictory objectives. In a letter dated December 14, 2001, Legacy's Compliance Director wrote Denise M. that she had two NAFs signed in March 2000, one showing high risk tolerance with investment objectives of long term growth and capital appreciation and the other showing medium risk tolerance and investment objectives of long term growth, capital appreciation and income. Yet Legacy did not question the appropriateness of these NAFs.

51.     Legacy ignored red flags relating to Karsner's sales practices, including multiple,

inconsistent and incomplete NAFs; incomplete mutual fund applications; website advertisements in which Karsner holds out as an investment adviser; and indications on Karsner's website, in correspondence, and in complaints that Karsner works with a person not registered through Legacy. Even when client complaints raised serious concerns and red flags about Karsner's sales practices, Legacy denied the complaints out of hand and failed to react to or correct the challenged practices.

52.    Legacy's failure to respond adequately to red flags and customer complaints has caused Legacy to violate the "know your customer" rule in that it failed to learn the essential facts relative to those customers and ensure that their investments were suitable.

53.    Legacy has either not responded or responded only after repeated letters to requests from the Division, including requests for client account records, copies of Karsner's seminar materials, its review of the sale of Class A and Class B mutual funds, and explanations concerning Legacy's supervisory practices and procedures.

<u>**COUNT I**</u>
**(Acting as an Unregistered Investment Adviser or Investment Adviser Representative)**
**(Joe Karsner & Associates and Karsner)**

WHEREAS, an investment adviser means a person who, for compensation:

(1)    engages in the business of advising others, either directly or through publications or writing, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities; or

(2)    1.    provides or offers to provide, directly or indirectly, financial and investment counseling or advice, on a group or individual basis;

   2.    gathers information relating to investments, establishes financial goals and objectives, processes and analyses the information gathered, and recommends a financial plan; or

3.    holds out as an investment adviser in any way, including indicating by advertisement, card, or letterhead, or in any other manner indicates that the person is, a financial or investment "planner", "counselor", "consultant", or any other similar type of adviser or consultant; and

WHEREAS, an investment adviser representative includes an individual who has a place of business in this State and is employed by or associated with a federal covered adviser and who

(1)    makes any recommendations or otherwise renders investment advice to clients;

(2)    manages accounts or portfolios of clients;

(3)    determines which recommendation or investment advice should be given with respect to a particular client account; or

(4)    holds out as an investment adviser; and

WHEREAS, Section 11-401 of the Securities Act makes it unlawful for any person to transact business in this State as an investment adviser or investment adviser representative unless the person is registered as an investment adviser or investment adviser representative and certain exceptions are not applicable; and

WHEREAS, the exceptions to the requirement that an investment adviser or investment adviser representative be registered are not applicable in this matter; and

WHEREAS, JK & A acted as an investment adviser and Karsner acted as an investment adviser representative by managing client portfolios, making recommendations and providing investment advice with regard to those portfolios and holding out as an investment adviser or investment adviser representative; and

WHEREAS, JK & A and Karsner have never been registered in this State as an investment adviser or investment adviser representative,

NOW, THEREFORE, IT IS HEREBY ORDERED that JK & A and Karsner show cause

18

why a final order should not be entered that orders them to cease and desist from engaging in activities in violation of the Securities Act including Section 11-401, assesses a statutory penalty of up to $5,000 per violation, permanently bars them from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section 11-701.1.

## COUNT II
### (Fraud in Connection with the Offer or Sale of Securities, Section 11-301)
### (Karsner)

WHEREAS, Section 11-301 of the Securities Act makes it unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to:

(1)     employ any device, scheme or artifice to defraud;

(2)     make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)     engage in any act, practice or course of business which operates or would operate as a fraud or deceit on any person; and

WHEREAS, Karsner omitted to state material facts, including but not limited to the following facts related to the sale of mutual funds:

(1)     That mutual funds he recommended to clients were risky;

(2)     That mutual funds he recommended to clients were unsuitable in light of the clients' investment objectives and risk tolerance; and

(3)     That clients may incur various sales charges; and

(4)     The basis for commissions he earned on the sale of mutual funds; and

WHEREAS, Karsner made material misrepresentations, including but not limited to the

following related to the sale of mutual funds:

    (1)    That clients could live off their retirement funds until they died and could earn a guaranteed 12% return on variable annuities, 7% return on fixed annuities and 4.5% return in a money market account;

    (2)    That clients would pay no front or back end load on the purchase or sale of mutual funds; and

    (3)    That clients do not pay his fees; and

WHEREAS, Karsner engaged in an act, practice or course of business which operates or operated as a fraud or deceit on his clients, including but not limited to:

    (1)    Transferring clients from Hancock to Legacy without their authorization;

    (2)    Switching clients from one portfolio of mutual funds to another portfolio in order to maintain control over the client's account after he moved to Legacy;

    (3)    Switching clients from one portfolio of mutual funds to another riskier portfolio;

    (4)    Completing multiple NAFs for clients without explaining to them the issues and changing their investment objectives and risk tolerance without adequate disclosure;

    (5)    Working on Legacy securities matters with a person who was not registered through Legacy; and

    (6)    Paying clients for costs they have incurred, including sales fees and commissions, unanticipated taxes and investment principal for unauthorized transactions,

NOW, THEREFORE, IT IS HEREBY ORDERED that Karsner show cause why a final order should not be entered that orders him to cease and desist from engaging in activities in violation of the Securities Act including Section 11-301, assesses a statutory penalty of up to $5,000 per violation, permanently bars him from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section

11-701.1.

## COUNT III
### (Fraud in Investment Advisory Activities; Section 11-302)
### (Joe Karsner & Associates and Karsner)

WHEREAS, Section 11-302 of the Securities Act makes it unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, or for acting as an investment adviser or representative under Section 11-101(h) or (i) of the Securities Act to:

(1)     employ any device, scheme or artifice to defraud;

(2)     engage in any act, practice or course of business which operates or would operate as a fraud or deceit on the other person;

(3)     engage in dishonest or unethical practices as the Commissioner may define by rule; or

(4)     knowingly make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

WHEREAS, the Securities Commissioner has defined by Rule .03B of the Code of Maryland Regulations .02.02.05 ("COMAR") dishonest or unethical practices to include:

(1)     recommending to a client to whom investment services are provided the purchase, sale or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the client's financial records;

(2)     placing an order to purchase or sell a security for the account of a client without having obtained, in advance, the authority to do so;

(3)     lending money to a client;

(4)     misrepresenting to an advisory client or prospective advisory client the

21

qualifications of the investment adviser, or an investment adviser representative employed by or associated with the investment adviser, or misrepresenting the nature of the advisory services being offered or fees to be charged for that service or omitting to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading; or

(5)    guaranteeing a client that a certain or specific result will be achieved, for example, gain or no loss, as a result of the advice that will be rendered; and

WHEREAS, JK & A and Karsner engaged in dishonest or unethical practices, employed

a device, scheme or artifice to defraud and engaged in an act, practice or course of business

which operates or would operate as a fraud or deceit on the other person by, among other matters:

(1)    switching clients from one portfolio of mutual funds to another more risky portfolio and making investment recommendations to clients that were unsuitable;

(2)    completing multiple NAFs for clients without explaining to them the issues and changing their investment objectives and risk tolerance without adequate disclosure;

(3)    carrying out transactions without obtaining prior client authority;

(4)    guaranteeing clients a specific result and promising clients that they could live off their investment income for the rest of their lives; and

(5)    paying clients for costs they incurred, including sales fees and commissions, unanticipated taxes and investment principal for unauthorized transactions; and

WHEREAS, JK & A and Karsner omitted to state material facts, including but not

limited to the riskiness of the mutual funds that he recommended; and

WHEREAS, JK & A and Karsner made untrue statements of a material fact, including

but not limited to the promises that clients could live off their retirement funds until they died

and could earn a guaranteed 12% return on variable annuities, 7% return on fixed annuities and

4.5% return in a money market account; and

WHEREAS, Karsner breached his fiduciary duty as an investment adviser representative

22

to act primarily for the benefit of his clients,

NOW, THEREFORE, IT IS HEREBY ORDERED that JK & A and Karsner show cause why a final order should not be entered that orders them to cease and desist from engaging in activities in violation of the Securities Act including Section 11-302, assesses a statutory penalty of up to $5,000 per violation, permanently bars respondents from the securities and investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged, and orders any other sanction or combination of sanctions as permitted under Section 11-701.1.

### COUNT IV
### (Revocation of Registration - Section 11-412)
### (Respondents Karsner and Legacy)

WHEREAS, Section 11-412 of the Securities Act provides that the Commissioner by order may deny, suspend, or revoke any registration if the Commissioner finds that the order is in the public interest and that the applicant or registrant or, in the case of a broker-dealer or investment adviser, any partner, officer, or director, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the broker-dealer or investment adviser,

(a)(2)    has willfully violated or willfully failed to comply with any provisions of this title, a predecessor act, or any rule or order under this title or a predecessor act;

(a)(7)    has engaged in dishonest or unethical practices in the securities or investment advisory or any other financial services business;

(a)(9)    is not qualified on the basis of factors such as training, experience, and knowledge of the securities or investment advisory or any other financial services business; or

(a)(10)   has failed reasonably to supervise the broker-dealer's agents;

23

WHEREAS, Karsner willfully violated or willfully failed to comply with sections 11-301, 11-302, and 11-401 of the Securities Act as detailed in this Order;

WHEREAS, respondents engaged in dishonest and unethical practices, as set forth in this Order;

WHEREAS, Karsner is not qualified on the basis of factors such as training, experience, and knowledge of the investment advisory business; and

WHEREAS, Legacy did not maintain a supervisory system reasonably designed to supervise its representatives and failed to implement its procedures so as reasonably to supervise Karsner,

NOW, THEREFORE, IT IS HEREBY ORDERED that respondents Karsner and Legacy show cause why a final order should not be entered that revokes their broker-dealer and broker-dealer agent registrations and orders any other sanction or combination of sanctions against them as permitted under Sections 11-412 and 11-701.1 of the Securities Act.

## REQUIREMENT OF ANSWER AND NOTICE OF OPPORTUNITY FOR HEARING

_____IT IS FURTHER **ORDERED**, pursuant to Section 11-701.1 of the Securities Act and COMAR 02.02.06.06, that each respondent shall file with the Securities Commissioner a written Answer to this Order within fifteen days of service of the Order. The Answer shall admit or deny each factual allegation in the Order and shall set forth affirmative defenses, if any. A respondent without knowledge or information sufficient to form a belief as to the truth of an allegation shall so state.

The Answer also shall indicate whether the respondent requests a hearing. A hearing to

24

determine whether the Order should be vacated, modified, or entered as final will be scheduled in this matter if one is requested in writing. Failure by any respondent to file a request for a hearing in this matter within fifteen days of receipt of the Order shall be deemed a waiver by that respondent of the right to such a hearing.

Failure to file an Answer, including a request for a hearing, shall result in entry of a final order:

(a)    directing that respondent permanently cease and desist from violation of the Securities Act; and

(b)    imposing a monetary penalty of up to $5,000 per violation of the Securities Act; and

(c)    barring that respondent from engaging in the securities or investment advisory business in Maryland for or on behalf of others, or from acting as principal or consultant in any entity so engaged; and

(d)    revoking that respondent's securities and investment advisory registrations.

**SO ORDERED:**

DATED:  March 19, 2007                                                   /s/
                                                                Melanie Senter Lubin
                                                                Securities Commissioner

ADMINISTRATIVE PROCEEDING
BEFORE THE
MARYLAND SECURITIES COMMISSIONER

IN THE MATTER OF:                          *

JOSEPH R. KARSNER, IV,                     *        File No. 2002-0391

JOE KARSNER & ASSOCIATES, LLC              *

      and                                *

LEGACY FINANCIAL SERVICES, INC.,           *

      Respondents.                       *

*    *    *    *    *    *    *    *    *    *    *    *

### AFFIDAVIT OF COMPLIANCE WITH SECTION 11-802(b)

     I hereby certify that, in accordance with section 11-802(b) of the Maryland Securities Act,

Title 11, Corporations and Associations Article of the Annotated Code of Maryland, I have

effected service upon the respondents, Joseph R. Karsner, IV, Joe Karsner & Associates, LLC

and Legacy Financial Services, Inc. by serving the foregoing  Order To Show Cause upon the

Securities Commissioner, and then by sending a copy of the Order and notice of service by

certified mail, return-receipt-requested, to the respondents at their last-known address.


Dated: March 19, 2007_____              _____/s/_____
                                           Lucy A. Cardwell


Subscribed and sworn to before me
this 19th day of March, 2007

_____/s/_____
Notary Public
My Commission expires: _____

# EXHIBIT 5

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 3414 | **DATE** | 4/26/2007 |
| **CASE TITLE** | Robert Craig Shirley vs. Paul Balsamello | | |

**DOCKET ENTRY TEXT**

For the reasons set forth in this Order, the Court dismisses this suit without prejudice for lack of subject matter jurisdiction and strikes as moot the Illinois Secretary of State, Securities Department's motions to intervene and dismiss [doc. nos. 17 & 20].

Docketing to mail notices.

| | Courtroom Deputy Initials: | LC/LM |
|---|---|---|

Robert Craig Shirley has filed an amended application to confirm an arbitration award entered by NASD Dispute Resolution, Inc. on June 24, 2005. The award resolved a complaint Paul Balsamello lodged against Shirley, and Shirley's employer RBC Dain Rauscher Inc. ("RBC"), regarding their handling of Balsamello's brokerage account. Balsamello claimed that Shirley recommended unsuitable investments to him and churned his account, and RBC failed to supervise Shirley appropriately, causing Balsamello to lose more than $400,000.00.

The arbitrators: (1) "sustained the claim of failure to supervise against RBC . . . finding that the concentration of investments became unsuitable for Claimant and rejected the claims of fraud, omission of facts, churning, breach of fiduciary duty and misrepresentation"; (2) ordered "RBC . . . [to] pay to Paul Balsamello the sum of $226,794.00 . . . as compensatory damages"; and (3) "recommend[ed] the expungement of all reference to this claim from . . . Shirley's registration records maintained by the NASD Central Registration Depository." (Am. Application Confirm, Ex. B, Arb. Award 2-3.)

After the award was issued, Shirley filed this application to confirm it. His application is not contested by Balsamello or the NASD, neither of which has appeared in this case. The Illinois Secretary of State, Securities Department ("ISD"), however, opposes the application and has filed a motion to intervene in the suit and a motion to dismiss the amended application.

The first, and as it turns out, the only, issue to be addressed is subject matter jurisdiction. Shirley alleges that Court has both diversity jurisdiction over his amended application and jurisdiction by virtue of the Federal Arbitration Act ("FAA"). (Am. Application Confirm ¶ 4.) The FAA, however, does not provide a basis for federal subject matter jurisdiction. *See Int'l Ins. Co. v. Caja Nacional De Ahorro y Seguro*, 293 F.3d 392, 395 (7th Cir. 2002).

Moreover, diversity jurisdiction exists only if the amount in controversy is more than $75,000.00. 28 U.S.C. § 1332. Shirley alleges that it is, but his allegation is belied both by the arbitration award itself and his amended application to confirm. As noted above, the arbitrators ordered RBC – not Shirley – to pay more than $200,000.00 in damages to Balsamello. RBC is not a party to this proceeding and Balsamello declined to appear in it. Thus, the monetary award is not at issue here. The only aspect of the award that is at issue is the arbitrators' "recommend[ation]" that Balsamello's complaint be expunged from Shirley's NASD records. It is not clear what monetary value, if any, an expungement recommendation has. What is clear, however, is that Shirley has not established that the amount-in-controversy element of diversity jurisdiction is met. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 237 (7th Cir. 1995) ("[I]f the court's jurisdiction is challenged as a factual matter . . . [,] the party invoking the jurisdiction bears the burden of supporting its jurisdictional allegations by competent proof . . . . [,i.e.,] proof to a reasonable probability that jurisdiction exists." (quotations omitted)).

That leaves federal question jurisdiction, which "arises only when the complaint . . . establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Minor v. Prudential Secs., Inc.*, 94 F.3d 1103, 1105 (7th Cir. 1996) (quotation omitted). The cause of action in this case is created by the FAA, which does not create jurisdiction, and the parties' arbitration agreement, a creature of state law. Further, though federal claims were raised in the arbitration, Shirley's confirmation request does not implicate any federal law. His request depends solely on the language of the award. It does not, therefore, invoke the Court's federal question jurisdiction. *See Collins v. Blue Cross Blue Shield of Mich.*, 103 F.3d 35, 38 (6th Cir. 1996) (no federal question jurisdiction over request to confirm arbitration award because the right to seek confirmation, which was provided by the arbitration agreement, was "clearly a state law matter," though the underlying claims arose from a federal statute); *O'Leary v. Fanghella*, 866 F. Supp. 1119, 1120-21 (N.D. Ill.1994) (stating that a "suit for enforcement of [an arbitration] award" is "the equivalent of a contract claim," which does not implicate federal question jurisdiction).

Because Shirley has not established that the Court has subject matter jurisdiction over it, this suit is dismissed without prejudice. ISD's motions to intervene and dismiss are stricken as moot.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**CIVIL DIVISION**

| | | |
|---|---|---|
| **JOSEPH R. KARSNER, IV,** | * | |
| **Petitioner**, | * | NASD Case No.: 04-07343 |
| | | Civil Action No.: 1:07-cv-00965-RJL |
| **v.** | * | |
| **JOANN HINKS and** | * | |
| **THE NATIONAL ASSOCIATION OF** | | |
| **SECURITIES DEALERS,** | * | |
| **Respondents**. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**ORDER DISMISSING OR DENYING PETITION
TO CONFIRM ARBITRATION AWARD**

Upon consideration of the motion filed by the Maryland Securities Commissioner in opposition to the Petition to Confirm Arbitration Award before the Court, the Court being fully apprised in the premises and good cause for granting that Motion having been shown, it is this __ __ day of _____ , 2007,

ORDERED, that the motion be and hereby is granted; and it is further

ORDERED, that the petition to confirm arbitration award be and is hereby DISMISSED or DENIED.

_____
Judge of the U.S. District Court
for the District of Columbia